Exhibit A

IN THE DISTRICT COURT OF PAYNE COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,
ex rel., the OKLAHOMA STATE
DEPARTMENT OF HEALTH,

Plaintiff,

vs.

No. C-90-91-H

KERR-McGEE CORPORATION,
a Delaware Corporation,

Defendant.

**CONSENT ORDER**

Now on this 4th day of May, 1990, this cause comes on for hearing before me the undersigned Judge of the District Court of Payne County, Oklahoma, the Plaintiff, the State of Oklahoma, ex rel. the Oklahoma State Department of Health, appearing by its counsel, and the Defendant, Kerr-McGee Corporation, appearing by its counsel. The defendant having filed herein a sufficient waiver of summons and entry of appearance, and both parties having waived notice of hearing, and both parties having stipulated to the jurisdiction and venue of this Court, the Court proceeded to hear the evidence relative thereto. The Court, having heard the oral testimony of witnesses sworn and examined in open court and being fully advised, finds that said consent order entered into by the State of Oklahoma, ex rel. the Oklahoma State Department of Health and Kerr-McGee Corporation should be approved.

**THE COURT THEREFORE FINDS, ORDERS, ADJUDGES, AND DECREES AS FOLLOWS:**

## I. JURISDICTION

This Court has jurisdiction of the subject matter herein and of the parties consenting hereto pursuant to the court's equitable power to abate public nuisances.

## II. AUTHORIZATION

The undersigned representative for each party certifies that he is fully authorized by the party whom he represents to enter into the terms and conditions of this consent order and to legally bind them to it.

## III. STATEMENT OF FACTS

1. Defendant Kerr-McGee Corporation ("Kerr-McGee") is a Delaware corporation licensed to do business in the State of Oklahoma.

2. From 1915 until 1972, a petroleum refinery was operated on approximately 335 acres near Cushing, Payne County, Oklahoma ("the Site"). Kerr-McGee owned the Site and operated the refinery from 1956 to 1972. Refinery wastes were disposed of by prior owners in five (5) unlined pits. Kerr-McGee asserts that it disposed of refinery wastes in only one of the pits (Pit #4).

3. The Kerr-McGee Corporation applied for and was issued two licenses by the U.S. Energy Commission (AEC) (now the U.S. Nuclear Regulatory Commission (NRC)) for the use of depleted, normal, and enriched uranium and natural thorium; these licenses

were SMB-664, issued November 7, 1962, and SNM-695, issued April 23, 1963. License SMB-664 (source materials license) authorized unlimited quantities in a variety of chemical forms of uranium and thorium which were generally received at the plant Site in the form of concentrates; the typical products were oxides or carbide metals of uranium and thorium in various ratios. SNM-695 (special nuclear material license) authorized limited quantities of enriched uranium generally received in the form of uranium hexafluoride or unirradiated scrap fuel elements. The products were various useful chemical forms of uranium for further processing as nuclear fuels. Uranium was processed at the Site from early 1963 until September of 1965, and thorium was processed from early 1965 until February of 1966.

4. By early summer of 1966, application had been made to the AEC for termination of the licenses and return of the vacated buildings to the Kerr-McGee Refining Division for unrestricted use. After cleaning and decontaminating activities and a review of these close-out procedures by both the company and AEC officials, the AEC formally terminated both licenses on July 25, 1966. Some of the waste generated by the decommissioning was shipped to the Cimarron Facility for storage purposes. Low concentration radioactive waste was buried in several trenches on the Cushing Site in accord with then-existing guidelines on such releases to the environment.

5. In 1972, the Site was surveyed for radioactivity again in conjunction with the closing of the oil refinery itself. Some

further clean-up and decontamination procedures were carried out as a result of this survey, and the material placed in Pit #4.

During the period 1979 through 1982, additional decontamination and clean-up procedures were carried out. On the Harris property (a small piece of the original refinery Site) which included the former processing building, additional clean-up was done around the building, the access road, and the nearby creek bank and drainage channel. On Kerr-McGee-owned property, additional areas were identified for further work. On both the Harris property and the Kerr-McGee refinery property, soil and waste was collected and drummed for disposal at one of the three commercial low-level radioactive sites. Soil with very low levels of contamination was buried on the Cushing Site.

6. As a result of concerns raised about the adequacy of the decontamination of processing sites closed out by licensees of the-then AEC and the NRC, the NRC requested the Oak Ridge Associated Universities (ORAU) (an NRC contractor) to perform a scoping study on the old Cushing Site. The scoping study included a rigorous examination of records, meetings with various officials including those in the U.S. Environmental Protection Agency which had been conducting studies on the Site, and radiation surveys at the Site and sampling to the extent deemed necessary.

On October 25, 1989, ORAU conducted a limited gamma radiation survey of selected areas of the Site, and confirmed the presence of low-level radioactive material in the northwest and northeast corners of the Site. Residual low-level radioactive material was

also found inside and around the former thorium processing building, which is no longer owned by Kerr-McGee.

7. The United States Environmental Protection Agency ("EPA") performed investigations on various portions of the Site in 1985, 1986, 1988, and 1989, and on October 26, 1989, EPA proposed the Site for inclusion on the National Priorities List. In the Hazard Ranking System package for the Site, EPA alleged that chromium, lead, uranium and radium were detected above background concentrations in the shallow unconfined aquifer under the Site.

8. EPA also allegedly found chromium, lead, uranium, radium, thorium, and low pH in certain soils and sludges at the Site.

## IV. DEFINITIONS

Certain terms used hereafter in this consent order and its attachments are defined as follows:

A. "Site" shall include the 335-acre area utilized in the operation of the former petroleum refinery and thorium processing facility in Cushing, Payne County, Oklahoma, as shown in Attachment I, and all areas of contaminated groundwater, surface water, and soils where such contamination has emanated from the defendant's waste, storage, disposal or processing activities.

B. "Work" shall include all actions taken by or on behalf of Kerr-McGee, called for by this consent order to carry out its objectives.

C. "Waste materials" shall include oily refining waste, radioactive materials, and the soils, sludges, sediment, and water at the Site that are contaminated with said materials. The term does not include naturally occurring concentrations of the constituents of the above materials. This definition is not intended to establish cleanup levels for the Site.

D. "The Department" means the Oklahoma State Department of Health.

E. "The State" means the State of Oklahoma as represented by the District Attorney and the Department.

F. "OSC" is the on-the-scene coordinator appointed by the Department to monitor the Work under this consent order.

G. "Project Coordinator" refers to the person designated as having the responsibility on behalf of Kerr-McGee to oversee the implementation of the Work under this consent order.

## V. APPLICABILITY

This consent order shall apply to and be binding upon the State and Kerr-McGee, as well as the successors and assigns of each. Kerr-McGee shall give notice of this consent order to each of its successors in interest prior to the transfer of interest and shall contemporaneously verify to the State that such notice has been given. Kerr-McGee shall not raise as a defense to any action to enforce this consent order the failure of any of its agents, officers, servants or employees to take such action as shall be required to comply with the provisions of this consent order.

## VI. OBJECTIVE

The objective of this consent order and plans implemented thereunder is to protect the public health and the environment through the prevention or reduction, to the greatest extent possible, of the release or migration of waste material to the groundwater, surface water, air, and soil in and around the Site through the detection of contaminated groundwater, surface waters, and soil, and through implementation of appropriate remedial actions, all under public scrutiny. This objective shall be accomplished pursuant to the provisions set forth in this consent order and Attachment II. The parties hope the delays and costs attendant to federal Superfund actions may thus be avoided while achieving the same level of cleanup.

## VII. COMMITMENTS BY KERR-MCGEE

1. Kerr-McGee shall undertake and assure, at its expense, the completion of the Work and implementation of the objective of this consent order.

2. The radiological assessment and cleanup work will be done in accordance with NRC's standards for protection of workers and the public against radiation exposure. The company's health physics and worker protection procedures in place at its NRC licensed activities will be followed and the surveys, analyses, monitoring, and any required cleanup will be performed by trained company employees under the direction of a certified health physicist.

3. Kerr-McGee shall assume any and all liability under applicable laws or regulations relating to the protection of the environment arising from or relating to its acts or omissions in the performance of the Work or its failure to perform fully or complete the Work.

4. The Work which Kerr-McGee will perform at the site is described in Attachment II. The Work shall be completed in accordance with the standards, specifications, and schedule of completion set forth in Attachment II.

5. Kerr-McGee shall be responsible for addressing any release or threatened release of waste materials at or from the Site. Further, Kerr-McGee shall take such action as is reasonably necessary to assure that an overflow of liquids from the pits on site does not occur.

6. Kerr-McGee agrees to undertake and complete a remedial investigation/feasibility study ("RI/FS"), as provided in Attachment II, and submit a report of these and past findings to the Department.

7. Kerr-McGee shall appoint a Project Coordinator to oversee implementation of the Work.

8. Upon completion of the RI/FS, Kerr-McGee shall present the remedial action alternatives in a report to the Department. The Department shall review the alternative remedial actions identified in the Feasibility Study and shall select the remedial action most appropriate for the Site after considering potential risks to the public health, safety and the environment, as well as the environmental and economic costs of implementing such

remedial action. Kerr-McGee shall implement the remedial action(s) selected by the Department at the conclusion of the Feasibility Study, provided that, if Kerr-McGee disagrees with the remedial action(s) selected by the Department, the parties shall attempt to resolve their disagreement for a period of thirty (30) days. This period may be extended by mutual agreement of the parties. During such negotiation period the parties shall determine which portions of the remedial action(s) selected by the Department are mutually acceptable and are not at issue. If the parties cannot resolve their disagreement within such negotiation period, Kerr-McGee shall commence, to the extent feasible, implementation of those portions of the remedial action(s) which are not at issue and shall notify this court of the dispute pursuant to Section XV, both within thirty (30) days from the conclusion of the negotiation period.

9. In the event that any remedial action undertaken by Kerr-McGee involves leaving any waste materials at the site, Kerr-McGee agrees to assume responsibility for all operation and maintenance activities ("O & M") required to maintain such a disposition of waste materials as required under this consent order and as set forth in Attachment II.

## VIII. COVENANT NOT TO SUE

Upon successful completion of all requirements of this consent order, including the Work pursuant to Attachment II, the Department covenants not to sue Kerr-McGee for conditions

identified or addressed in the RI/FS provided for herein. The Department agrees not to prosecute (i) the pending action or (ii) any other enforcement actions concerning such matters against Kerr-McGee so long as it is in compliance with the terms of this consent order. This consent order shall not be construed as a waiver by the Department of the right to redress future violations and obtain penalties or injunctive relief for matters other than those covered by this covenant. The Department expressly reserves the right to institute proceedings seeking to compel

Kerr-McGee to perform additional response work at the Site if:

(a) Conditions at the Site, previously unknown to the Department, are discovered after the entry of this consent order; or

(b) Information is received, in whole or in part, after the entry of this consent order, and these previously unknown conditions or this new information indicates that the remedial action chosen for the Site is not protective of human health and the environment.

**IX. REPORTING AND RECORD KEEPING: RETENTION AND AVAILABILITY OF INFORMATION**

1. Prior to entry of the consent order (or as soon thereafter as the documents become available), the State and Kerr-McGee shall exchange copies of all technical information about the Site, including but not limited to, laboratory reports,

test results, analytical data, and analyses of samples previously taken at the Site.

2. Kerr-McGee shall provide written progress reports to the State which describe the actions which have been taken during the previous calendar month toward achieving compliance with this consent order. Reports shall be submitted within ten (10) days after the first day of each calendar month during which such activities are in progress, beginning in the first full calendar month following the entry of this consent order.

The reports shall include:

(a) The date any task was completed;

(b) An identification of any event which may cause a delay in completing any future tasks, and a summary of efforts made, if any, to limit the delay;

(c) The progress made toward completing the tasks as described in Attachment II; and

(d) The activities scheduled for the next month.

3. Kerr-McGee shall preserve all records, documents, and information relating to the performance of the Work at the site and the removal of waste materials from the site, including sampling analyses, chain of custody records, manifests, contracts, trucking logs, bills of lading, receipts, records pertaining to traffic routing, destination of waste materials, and volume and chemical nature of such materials, correspondence, and other documents produced during the Work for a period of 6 years following completion of the Work. The State shall have access to such records, and copies shall be provided to the

Department upon request. Copies of final reports submitted to the Department shall also be provided to a public repository established in Cushing.

4. Kerr-McGee shall collect such samples as required in Attachment II. The OSC may require split sampling where appropriate. Kerr-McGee agrees to cooperate with representatives of the Department and to permit such representatives to collect samples, including split samples, at any locations at the Site. The Department agrees to give Kerr-McGee reasonable advance notice of the sampling procedures that will be used and what constituents the samples will be analyzed for so that Kerr-McGee may collect split samples. Sampling protocols shall be established in a work plan developed under Attachment II. Each party shall provide copies of the results of any such samples to the other party. All sampling and analysis shall be done pursuant to USEPA protocols and chain of custody procedures established by the National Enforcement Investigation Center.

5. Upon completion of the final remedy as provided in the consent order and Attachment II, Kerr-McGee shall submit a certification by a duly registered Professional Engineer to the Department which states that the Work has been completed in satisfaction of the requirements and objectives of this consent order. The Department shall review the Work within ninety (90) days of receipt of the certification and indicate agreement or disagreement as to its satisfactory completion, or the Department shall notify Kerr-McGee in writing before the end of the ninety (90) day period that additional time is needed to review the

Work. If the Department does not advise Kerr-McGee's Project Coordinator in writing of its agreement or disagreement concerning the completeness of the Work performed within such ninety (90) day period, then Section X shall apply. If the Department determines that the Work has not been completed in accordance with the standards and specifications set out in Attachment II, the Department shall notify Kerr-McGee's Project Coordinator in writing as to what should be done to complete the Work, referencing the specific portion(s) of Attachment II and proposing a schedule for completion. If Kerr-McGee disagrees with any such determination by the State, the provisions of Section XV shall apply.

## X. FORCE MAJEURE

1. "Force Majeure" for purposes of this consent order is defined as any event arising from circumstances beyond the reasonable control of Kerr-McGee which cannot be overcome by the exercise of due diligence by Kerr-McGee. Any failure by Kerr-McGee to comply with any requirements of this consent order or plans incorporated thereunder which results from a Force Majeure event shall not be a violation of this consent order. To the extent such failure is caused by a Force Majeure event the obligation to perform hereunder shall be suspended for a period of time equal to the duration of the Force Majeure event or an amount which is reasonably necessary to allow Kerr-McGee to compensate for the Force Majeure event.

2. Kerr-McGee shall notify the OSC in writing within

fifteen (15) days after Kerr-McGee learns of a Force Majeure event and that it is likely that a failure to perform a scheduled requirement under this consent order will result therefrom. Failure to so notify the OSC shall constitute a waiver of any defense under this section arising from said circumstances. In the notification, Kerr-McGee shall describe in detail the nature of the Force Majeure event and the failure to perform; the reasons therefor; the expected duration of the Force Majeure event and failure to perform; and the measures taken or to be taken to prevent or minimize any such failure. Kerr-McGee will adopt all reasonable measures to avoid or minimize any such failure.

3. If Kerr-McGee and the Department cannot agree whether the reasons for the delay or noncompliance were beyond the reasonable control of Kerr-McGee, such dispute or disputes shall be resolved by the court pursuant to Section XV. Kerr-McGee shall have the burden of going forward and proving that the circumstances alleged to be causing the delay or noncompliance were beyond its reasonable control.

4. Increased costs associated with implementing the measures required by this consent order do not constitute a Force Majeure event within the meaning of this section.

## XI. STIPULATED PENALTIES

### A. Consent Decree Noncompliance Penalty

1. Deadlines established pursuant to this consent order for completion of the interim RI/FS reports, the final RI/FS

reports, and the final remediation of the Site for both radiological and non-radiological work, shall be Level 1 requirements. Failure by Kerr-McGee to stop work in accordance with the OSC's stop work order is a Level I penalty. All other requirements under this consent order shall be Level 2. In the event Kerr-McGee fails to comply with any requirements set forth in this consent order or Attachment II or plans submitted thereunder, upon receipt of a notice of violation from the Department identifying such noncompliance Kerr-McGee shall have fifteen (15) days to correct the noncompliance, except that no such time will be allowed for any failure by Kerr-McGee to perform its Level 1 requirements, the deadlines for which may be extended pursuant to Section X. The stipulated penalty for a Level 1 noncompliance shall be One Thousand Dollars ($1,000.00) per day of noncompliance. If the noncompliance concerns a Level 2 requirement and is not corrected after fifteen (15) days, Kerr-McGee shall pay to the Controlled Industrial Waste Fund, as a stipulated penalty, Five Hundred Dollars ($500.00) per day of noncompliance until such time as the requirements are complied with.

2. Any stipulated penalties for which Kerr-McGee shall become liable for under this consent order shall be paid by certified check made payable to the Department and noting for deposit in the Controlled Industrial Waste Fund and delivered to:

Damon Wingfield, Chief<br>
Waste Management Service<br>
Oklahoma State Department of Health<br>
Box 53551<br>
Oklahoma City, OK 73152

B. **Reimbursement Payment**

1. At the end of each quarter (fiscal year ending June 30), the Department shall submit to Kerr-McGee an accounting of all response and oversight costs incurred by the State with respect to this consent order. Kerr-McGee shall, within thirty (30) calendar days of receipt of such accounting, remit a certified check for the amount of those costs made payable to the Controlled Industrial Waste Fund which shall be delivered to the aforementioned address. Such oversight costs shall not exceed $50,000.00 per year, plus split sampling costs which shall not exceed $25,000.00 per year.

## XII. SITE ACCESS

The OSC and other authorized employees and representatives of the Department, by reasonable notice to Kerr-McGee or presentation of appropriate credentials, shall have access to the Site at all reasonable times for the purposes of conducting investigations, including collecting samples, observing and monitoring the progress of the Work, and for any other reasonable purpose relating to the role of the Department. In conducting any inspections of the Site, the OSC and other authorized employees and representatives of the Department may use a camera, sound recording or other documentary type equipment deemed necessary by the OSC or the Department, for investigations of the Site or observations of Work in progress and to verify all Work was completed as provided in the consent order and Attachment II. In conducting such activities the OSC and the Department, or

their agents and representatives, agree to protect the confidentiality of any identified proprietary process or activity of Kerr-McGee or its contractors. The Department, through the persons named in Section XVI, shall provide Kerr-McGee a list of personnel authorized by the State to conduct such activities at the Site and shall update such list from time to time. Kerr-McGee may deny access to anyone excluded from the list.

In the event that Kerr-McGee is denied access to a portion of the Site by the current owner the State will assist Kerr-McGee in securing access to the Site.

## XIII. RESPONSIBILITIES AND AUTHORITY OF ON-SCENE COORDINATOR

The OSC shall have the authority to monitor the Work and to issue a stop-work order to prevent a significant threat to public health or the environment.

Kerr-McGee's Project Coordinator shall orally notify the OSC immediately upon the occurrence of any event which, in his/her judgment, may threaten human health or the environment. The notice shall be followed by written notification by Kerr-McGee to the State as provided in Section XVI within five (5) calendar days explaining the event, any action taken to eliminate the threat, and the precautions taken to avoid recurrence of a similar threat.

## XIV. REPORT AND PLAN REVIEW

All plans and reports submitted by Kerr-McGee pursuant to

this consent order must be approved by the Department in writing. The Department shall review the report or plan and shall within sixty (60) days indicate approval or disapproval thereof or notify Kerr-McGee in writing before the end of the sixty (60) day period that additional time is needed to review the report or plan. The first thirty (30) days of this period shall be open for formal public comment for the RI/FS reports. If the

Department fails to advise Kerr-McGee of approval or disapproval and the reasons therefor in writing within such sixty (60) day period, Section X shall apply. If any plan or report is disapproved, it shall be resubmitted to the Department within thirty (30) days unless the parties agree upon a shorter or longer period. If, after resubmission, the Department disapproves the report or plan, Section XV shall apply.

## XV. DISPUTE RESOLUTION

1. Any dispute which arises with respect to the meaning, application, interpretation, amendment or modification of this consent order and Attachment II, their terms, any plan or report required thereunder, or with respect to any party's compliance herewith or any delay hereunder (including but not limited to disputes concerning the adequacy of reports or plans for implementing Attachment II and the propriety of any stipulated penalty or oversight costs assessed under Section XI), shall in the first instance be the subject of informal negotiations. Such period of informal negotiations shall commence upon the

transmission by Kerr-McGee to the Department of written notification of the invocation of Dispute Resolution. Informal negotiations shall not extend beyond thirty (30) calendar days from the date the Department receives notification unless the parties agree otherwise in writing.

2. After the period for informal negotiations, Kerr-McGee or the Department may file with the Court a petition requesting the Court to hear and resolve the dispute. The petition shall describe the nature of the dispute and include a proposal for its resolution. The Department or Kerr-McGee, as appropriate, shall have thirty (30) days to respond to the petition. The moving party shall bear the burden of proof.

3. Should the remedial action(s) selected by the Department pursuant to Section VII.7. be the subject of a dispute presented to the Court for resolution, each party shall submit the names of at least three independent technical consultants to the Court. These consultants shall have technical expertise regarding the remedial action(s) in dispute, and the Court shall select three technical experts, including at least one from each list, to form an expert panel. The expert panel will hear testimony and weigh evidence on technical matters in dispute and will recommend the most appropriate remedial action(s) to the Court. The Court will weigh the recommendation along with legal and equitable considerations and render its decision.

4. The filing of a petition by Kerr-McGee asking the Court to resolve a dispute shall not of itself postpone the deadlines

for Kerr-McGee to meet its obligations under this consent order or stay the accrual of stipulated penalties with respect to the disputed issue. However, the obligation to pay stipulated penalties shall be stayed pending resolution of the dispute.

## XVI. NOTICES

Whenever, under the terms of this consent order, notice is required to be given or a report or other document is required to be forwarded by one party to another, it shall be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice in writing to the other parties of another individual designated to receive such communications. Notice to the individuals listed below shall constitute complete satisfaction of any notice requirement of the order with respect to the State and Kerr-McGee, respectively.

As to Kerr-McGee:

Kerr-McGee Corporation
c/o Barbara L. Hoffman
P. O. Box 25861
Oklahoma City, OK 73125

As to the Department:

Damon Wingfield
Waste Management Service
Oklahoma State Department
of Health
Box 53551
Oklahoma City, OK 73152

## XVII. RETENTION OF JURISDICTION

The court shall retain jurisdiction of this matter for the purposes of interpreting, implementing and enforcing the terms and conditions of this consent order and for the purpose of adjudicating all matters of dispute among the parties.

## XVIII. SEVERABILITY

It is the intent of the parties hereto that the provisions of this consent order shall be severable, and should any provisions be declared by a court of competent jurisdiction to be inconsistent with state or federal law, and therefore unenforceable, the remaining clauses shall remain in full force and effect.

## XIX. VENUE

The venue of any action commenced in district court for the purposes of interpretation, implementation, and enforcement of the terms and conditions of this consent order shall be in Payne County.

## XX. STIPULATION OF USE

This consent order is entered into for the purposes of settlement only and neither the fact that a party has entered into this consent order nor the Statement of Facts appearing herein shall be used for any purpose in this or any other proceeding except to enforce the terms hereof by the parties to this agreement. As to others who are not parties to this consent order, nothing in this consent order and attachments shall constitute an admission by Kerr-McGee of the statement of facts contained herein, and entry into this consent order shall not constitute an admission by Kerr-McGee of liability for conditions at or near the site nor a waiver of any right, cause of action, or defense otherwise available to them. Subject to the foregoing

Kerr-McGee reserves all rights, causes of action and defenses as are available to it.

WHEREFORE, the parties, by their counsel, enter into this consent agreement and submit it to the Court that it may be approved and entered.

THE STATE OF OKLAHOMA
DISTRICT ATTORNEY

DATED: BY:

OKLAHOMA STATE DEPARTMENT OF HEALTH

DATED: 5-3-90 BY: Mark S Coleman

KERR-MCGEE CORPORATION

DATED: May 4, 1990 BY: Russell G Horner
Vice-President + General Counsel

ATTEST
Don Hager
Don Hager
Ass't. Secretary

APPROVED AND SO ORDERED THIS 4th DAY OF May, 1990.

Donald L. Worthington
Judge of the District Court

ATTACHMENT I




SITE PLAN FOR KERR-McGEE, CUSHING, OKLAHOMA

**ATTACHMENT 2: SCOPE OF WORK**

## I. RADIOLOGICAL INVESTIGATION AND REMEDIATION

Kerr-McGee will actively pursue a thorough characterization survey of the entire site, as owned by Kerr-McGee at the time of the licensed activities, and any vicinity properties, including skull Creek and other drainage pathways, where incidental contamination may have occurred. Radiological information to be developed by Kerr-McGee includes exposure rates, surface contamination levels, and radionuclide concentrations in soil. Locations of residual radioactive material exceeding current guidelines will be accurately defined and, if necessary, controls implemented to prevent the removal or inadvertent spread of contamination to adjacent properties.

Deadline to complete characterization survey and submit report to the Department: 12 months from entry of the consent order.

### A. Soil Around Harris and Martin Buildings

Surveys done by Oak Ridge Associated Universities ("ORAU") on October 25, 1989 and Kerr-McGee Corporation on November 2, 1989 identified several areas of elevated gamma levels around the Harris and Martin buildings. See Figure 1 and Table 1. Areas identified with elevated gamma levels will be analyzed for uranium and thorium concentration, and if necessary, excavated to achieve a concentration consistent with Option 1 of NRc's Branch

Technical Position on Disposal or Onsite Storage of Residual Thorium or Uranium from Past Operations (see Table 2) and backfilled to existing grade with clean soil. The excavated material will be drummed and shipped to an appropriate low-level radioactive waste disposal site.

Estimated time to complete: 2 months from entry of consent order.

B. Harris Building

The survey results confirm that residual radioactivity on the building surfaces meets the unrestricted release criteria used at the time of license termination in 1966. (See Table 3). Moreover, the survey shows that current NRC criteria for residual removable radioactivity are met for both thorium and uranium. In addition, the current NRC criteria for fixed uranium were generally met, except for two small areas which were above the limit. The current criteria for fixed thorium radioactivity could be exceeded, pending further investigations to determine if the radioactivity is due to thorium and taking into consideration averaging over areas.

Since the elevated readings found could be the result of either or both uranium and thorium, further sampling will be done to determine the nuclide involved. If uranium is the source, no further cleanup should be necessary. If thorium is the source, then further surveys are indicated to determine if remedial work

is appropriate. The two identified areas with radioactivity exceeding the fixed uranium limit will be decontaminated, with the material removed placed in disposal drums for shipment to an appropriate disposal site.

> Estimated time to complete decontamination of two areas exceeding fixed uranium limit: 1 week from entry of consent order.

> Estimated time to determine if radioactivity due to thorium or uranium: 1 month from entry of consent order.

> Estimated time to perform further surveys if source is thorium and to decontaminate if necessary: 7 months from entry of consent order.

C. Northern Portion of Site

The ORAU survey indicated the presence of low-level radioactive materials in the vicinity of the former tank berms in the northwest corner of the site, in and around Pit 4, and in the northeast corner where materials were placed in one or more trenches. Kerr-McGee will conduct a radiological survey of these areas, as it did for the Martin and Harris properties on November 2, in the following manner:

The areas will be scanned with gamma sensitive NaI detectors on a 10 by 10 meter grid. Locations which exhibit count rates significantly above the natural background level, as determined by the Department, will be marked with flags for follow-up detailed exposure measurements and sampling for radionuclide and concentration characterization. Surface and one meter dose rate and exposure rate measurements will be taken at each flagged location with the Bicron Microrem meter and the Eberline MicroR meter. Soil samples to a depth of 10 feet (at one foot intervals) will be collected at selected locations. After the data is collected, a feasibility study of alternative remedial actions will be prepared for submittal to OSDH. This study will be in accordance with applicable EPA and NRC guidelines, and is subject to rejection or modification by the OSDH if the NRC disapproves of any of the alternative remedial actions.

Estimated time to complete radiological survey: 12 months from entry of consent order.

Estimated time to complete feasibility study: 24 months from entry of consent order.

## II. NON-RADIOLOGICAL INVESTIGATION AND REMEDIATION

### A. Investigation to date:

The Site contains five (5) oily sludge pits, containing waste from refinery operations. The waste material consists of high molecular weight aromatic asphaltenes with sulfuric acid and clay intermixed. Kerr-McGee has installed 38 monitor wells to evaluate the shallow alluvium around the pits and has fenced the area to protect the public.

Kerr-McGee has screened the following technologies to determine whether they could be used to effectively treat and/or dispose of the waste sludge:

a) incineration;
b) oil recovery through solvent extraction;
c) biodegradation either by landfarming or in process vessels;
d) neutralization and solidification;
e) neutralization and use as an alternative fuel for a cement kiln.

### B. Remedial Investigation and Feasibility Study Reports:

Kerr-McGee shall provide a report summarizing in detail the investigation to date. This report should concentrate on a characterization of the site. Information provided should

include a description of the site, a summary of the site history, a summary of the numbers and types of samples collected, maps of sampling locations, maps of the monitor well locations, as detailed a description as possible of the geological strata underlying the site, a characterization of the waste materials, and identification of any significant data gaps perceived by Kerr-McGee. The Department shall review and comment on the report. If the Department identifies any significant data gaps, Kerr-McGee shall be required to submit a workplan detailing steps to complete the investigation phase to the satisfaction of the Department. Upon approval by the Department, Kerr-McGee shall implement the workplan.

Kerr-McGee shall prepare a report summarizing the current status of the feasibility study it is presently conducting. The Department will review and comment on this report. If Kerr-McGee in good faith disagrees with any of the Department's comments, it shall so notify the Department in writing within seven (7) days of its receipt of said comments. This notification will invoke the commencement of Dispute Resolution pursuant to Section XV of this Consent Order.

An overall schedule for the RI/FS shall be included in the report. A list which summarizes all deliverables and corresponding submittal dates from Kerr-McGee to the Department shall be included.

Deliverables should include a final remedial investigation report as well as the final feasibility study report. Specific due dates shall be established for these reports by the Department and Kerr-McGee within fourteen (14) days after the Department has reviewed and commented on the interim reports. If no agreement on due dates is reached during that period, Kerr-McGee may invoke Dispute Resolution by notifying the Department in writing within 24 hours after the close of that period. If no such notificatin is given, the dates proposed by the Department shall be considered accepted by Kerr-McGee. The due dates accepted by Kerr-McGee and/or resolved pursuant to Section XV shall be requirements pursuant to the consent order.

Deadline for submittal of interim remedial investigation and feasibility study report: 90 days from entry of consent order.

**SUMMARY OF MAJOR DEADLINES DESCRIBED IN ATTACHMENT 2**

| Activity | Characterization Survey | Interim RI/FS | Final RI/FS | Public Comment | Begin Work |
|---|---|---|---|---|---|
| **RADIOLOGICAL** | 12 months from entry of Consent Order | n/a | RI: 24 months after entry of Consent Order | one month after final FS | entry of Consent Order |
| **NON-RADIOLOGICAL** | n/a | 3 months from entry of Consent Order | As determined by interim RI/FS | one month after final RI/FS | upon selection of remedy |

FIGURE 1



CUSHING SITE
HARRIS & MARTIN PROPERTIES
NORTH
10N 20W
1
D
ROAD
10N 70W
CONCRETE
PAD
SKULL
CREEK
E
C
GRAVEL
DOCK
2
A
MARTIN
BUILDING
HARRIS
BUILDING
7
5
6
SUMP
DOCK
9
8
MARTIN STORAGE
BUILDING
CONCRETE
PAD
3
B
4
DITCH
BRIDGE
SAMPLE & MEASUREMENT LOCATIONS
■ 1 - SAMPLE & MEASUREMENT
■ A - MEASUREMENT ONLY
■ * - BACKGROUND SAMPLE
Samples Collected / Measurements on 11/02/89

# TABLE 1

## Measurement Results

## Harris & Martin Properties - Cushing, Oklahoma

## November 2, 1989

| Location | Bicron - urem/hr Surface | 1 Meter | Eberline - uR/hr Surface | 1 Meter |
|---|---|---|---|---|
| 1 | 16 | 9 | 25 | 6 |
| 2 | 200 | 30 | 230 | 30 |
| 3 | 250 | 65 | 290 | 80 |
| 4 | 55 | 12 | 60 | 13 |
| 5 | 25 | 14 | 24 | 14 |
| 6 | 9 | 15 | 10 | 17 |
| 7 | 300 | 60 | 300 | 60 |
| 8 | 75 | 16 | 90 | 16 |
| 9 | 1650 | 135 | 1600 | 120 |
| A | 35 | 15 | 32 | 16 |
| B | 55 | 25 | 60 | 24 |
| C | 14 | 10 | 20 | 12 |
| D | 17 | 7 | 20 | 12 |
| E | 35 | 16 | 34 | 19 |

TABLE 2

NRC

BRANCH TECHNICAL POSITION

Maximum Allowable Concentration in Waste for Options 1, 2, 3 and 4

| Type of Wastes | Maximum Allowable Concentration (pCi/g) Option 1 | Option 2 & 3 | Option 4 |
|---|---|---|---|
| 1. Depleted Uranium (U-238) | | | |
| a. Insoluble | 35 | 300 | 3,000 |
| b. Soluble | 35 | 100 | 1,000 |
| 2. Enriched Uranium (U-238, U-235, U-234) | | | |
| a. Insoluble | 30 | 250 | 2,500 |
| b. Soluble | 30 | 100 | 1,000 |
| 3. Natural Uranium (U-238, U-234) | | | |
| a. Insoluble | 10 | 40 | 200 |
| b. Soluble | 10 | 40 | 200 |
| 4. Natural Thorium (Th-232, Th-228) | | | |
| a. Insoluble | 10 | 50 | 500 |
| b. Soluble | 10 | 50 | 500 |

TABLE 3

RADIOACTIVITY CONTAMINATION LIMITS FOR

ABANDONMENT OF FACILITIES AND EQUIPMENT

1. The maximum amount of fixed alpha radioactivity in disintegrations per minute per 100 square centimeters on buildings or equipment should not exceed 25,000.

2. The average amount of fixed alpha radioactivity in disintegrations per minute per 100 square centimeters on buildings or equipment should not exceed 5,000.

3. The maximum amount of removable (capable of being removed by wiping the surface with a filter paper or soft absorbent paper) alpha radioactivity in disintegrations per minute per 100 square centimeters on buildings or equipment should not exceed 1,000.

4. (a) The maximum level at one centimeter from the most highly contaminated surface of a building or piece of equipment measured with an open-window beta-gamma survey meter through a tissue equivalent absorber of not more than seven milligrams per square centimeter should not exceed one millirad per hour.

   (b) The average radiation level at one centimeter from the contaminated surface of the building or equipment measured in the same manner should not exceed 0.2 millirad per hour.

5. The contamination limits for abandonment of facilities involving U-233 or plutonium should not exceed 1/10 of the limits in items 1, 2 and 3 above.

JUN 10 1966

TABLE ( )nt'd.

## COMPARISON OF FACILITY RELEASE LIMITS

| Isotope | 1966 Average Fixed (dpm/100cm²) | 1966 Maximum Fixed (dpm/100cm²) | 1966 Removable (dpm/100cm²) | 1989 Average Fixed (dpm/100cm²) | 1989 Maximum Fixed (dpm/100cm²) | 1989 Removable (dpm/100cm²) |
|---|---|---|---|---|---|---|
| Uranium | 5,000 | 25,000 | 1,000 | 5,000 | 15,000 | 1,000 |
| Thorium | 5,000 | 25,000 | 1,000 | 1,000 | 3,000 | 200 |

1085E