Exhibit D

Cushing

# LEASE AGREEMENT

THIS LEASE AGREEMENT, executed as of August 4, 1995 ("Lease"), by and between KERR-McGEE CORPORATION ("Lessor"), a Delaware corporation, having an address at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma 73102, and NOTTI GATHERING COMPANY, INC. ("Lessee"), a Delaware corporation.

WITNESSETH:

WHEREAS, on the date hereof Lessor has sold to NGC OIL AND TRADING TRANSPORTATION, INC. all of the capital stock of Lessee; and

WHEREAS, the Leased Property (as hereinafter defined) is contained within property which is subject to that certain Consent Order (as the same may be hereafter amended or supplemented, "Consent Order") dated May 4, 1990, entered into between the State of Oklahoma, acting through the Oklahoma State Department of Health, and Lessor, and approved by the District Court of Payne County, Oklahoma (Cause No. C-90-91-H); and

WHEREAS, the Leased Property is contained within property as to which Lessor is subject to a license ("NRC License") from the United States Nuclear Regulatory Commission ("NRC") for the remediation of certain low-level radioactive materials;

WHEREAS, in order to maintain compliance with the Consent Order and the anticipated requirements of the NRC License, the Leased Property was dividended from Kerr-McGee Refining Corporation ("KMRC") to Lessor prior to the sale of the stock of Lessee by Lessor to NGC Oil and Trading Transportation, Inc., and the purpose of this Lease is to establish that, as between Lessor and Lessee, all of the economic risk of gain and loss of the Leased Property shall reside in Lessee for all purposes, including income tax purposes, recognizing that under the Consent Order and the anticipated NRC License and related applicable NRC requirements, Lessor shall have certain obligations until the remediation contemplated thereunder have been completed;

NOW, THEREFORE, Lessor and Lessee covenant and agree as follows:

1. Lease of Premises. In consideration of the rents and covenants herein stipulated to be paid and performed by Lessee and upon the terms and conditions herein specified, Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, property and assets consisting of (i) the land described in Schedule A ("Land"), together with any and all buildings, fixtures and other improvements now or hereafter located on the Land ("Improvements"), (ii) the respective easements, rights and appurtenances relating to the Land and the Improvements ("Appurtenances") and (iii) the machinery, equipment, furniture and other tangible personal property constituting fixed assets of Lessor and located on the Land and Improvements on the date of execution hereof (the "Equipment"), all of which are hereinafter sometimes collectively referred to as the "Leased Property". The Appurtenances include the right to use the pipelines connecting the tank farms located on

the Land with Lessor's refinery located adjacent thereto and other related facilities owned by Lessor, to the extent such pipelines were used in the ordinary course of operations of such tank farms immediately prior to the conveyance of the Leased Property from KMRC to Lessor as reflected in the recitals of this Lease.

2. Use of Leased Property; Quiet Enjoyment. Lessee may occupy and use the Leased Property for any or all of the purposes for which it was last being used by KMRC (as owner of fee title thereof) prior to the date hereof, and no other purpose. So long as no Event of Default (as hereinafter defined) has occurred hereunder and is continuing, Lessee shall have the right to the peaceful and quiet occupation and enjoyment of the Leased Property in accordance with the terms of this Lease during the Term (as hereinafter defined), free from disturbance by Lessor or anyone claiming by, through or under Lessor (other than those with claims the existence of which constitutes a Permitted Encumbrance as defined in the Stock Purchase Agreement as defined in Section 16 below); provided, however, that Lessor and its agents may, upon reasonable notice and subject to any restrictions imposed by law, enter upon and inspect the Leased Property at reasonable times for any reasonable purpose; and provided further that Lessor and its agents may enter upon and maintain equipment and activities upon the Leased Property in connection with the remediation hereinabove described, and provided that this Lease is subject to the Consent Order and the anticipated NRC License and the rights of governmental agencies having jurisdiction over the Leased Property or over Lessor to enter upon the Leased Property and interfere with Lessee's quiet occupation and enjoyment, and provided that nothing contained herein shall be interpreted to prevent Lessee from modifying, expanding, moving, or reconfiguring the Improvements and Equipment on the Land ("Changes"), so long as such Changes do not violate the terms of the Consent Order or the NRC License or, in any way, interfere with Lessor's compliance therewith.

3. Term. The Leased Property is leased for a term (the "Term") commencing on the date hereof and ending on the tenth anniversary thereof, subject to extension as provided in Section 10(c).

4. Rent. (a) Lessee shall pay a rental payment of One Dollar ($1.00) contemporaneously with the execution hereof, the receipt of which is acknowledged currently with the execution hereof ("Basic Rent").

(b) All amounts which Lessee is required to pay pursuant to this Lease (other than Basic Rent), together with every fine, penalty, interest, and cost which may be added for nonpayment or late payment thereof, shall constitute additional rent ("Additional Rent"). If Lessee shall fail to pay any Additional Rent when the same shall become due, then Lessor shall have all rights, powers and remedies with respect thereto as are provided herein or by law in the case of nonpayment of Basic Rent and shall, except as expressly provided herein, have the right to pay the same on behalf of Lessee. Lessee shall pay to Lessor interest at the rate ("Overdue Rate") equal to ten percent (10%) (but in no event shall such rate of interest exceed the maximum rate allowed under applicable law) on all overdue Basic Rent and Additional Rent from the due date thereof until paid.

5. Net Lease; Nonterminability. This Lease is a net lease and, any present or future law to the contrary notwithstanding, shall not be terminated by Lessee except as expressly provided herein. Lessee shall pay all costs, taxes, assessments and other expenses of every character, foreseen or unforeseen, for the payment of which Lessor or Lessee is or shall become liable by reason of its estate or interest in the Leased Premises, or which are connected with or arise out of the possession, use, occupancy, maintenance, repair, replacement, rebuilding or mortgaging of the leased Premises or any portion thereof, including without limitation those specifically referred to in this Lease. Lessee's obligation to pay Basic Rent, Additional Rent and any other sum payable hereunder shall be absolute and unconditional and shall not be subject to any delay, abatement, reduction (except as described in Section 4 or otherwise expressly provided herein), setoff, counterclaim, recoupment, defense or deduction with respect to any sums payable hereunder, nor (except as otherwise expressly provided herein) shall the obligations of Lessee hereunder be affected, by reason of: (i) any damage to or destruction of the Leased Property or any part thereof; (ii) any taking of the Leased Property or any part thereof by condemnation or otherwise; (iii) any prohibition, limitation, restriction, or prevention of Lessee's use, occupancy or enjoyment of the Leased Property or any part thereof, or any interference with such use, occupancy or enjoyment by any person; (iv) any proceeding relating to Lessor; (v) the impossibility or illegality of performance by Lessor, Lessee or both; (vi) any action of any governmental authority; (vii) Lessee's acquisition or ownership of all or any part of the Leased Property; or (viii) any other cause, whether similar or dissimilar to the foregoing, any present or future law to the contrary notwithstanding and whether or not Lessee shall have notice or knowledge of any of the foregoing.

6. Taxes and Assessments; Compliance with Laws. Lessee shall pay, prior to the later of (i) fifteen (15) days after receipt from Lessor of the appropriate tax invoice and (ii) delinquency, all real estate taxes assessed or levied against the Leased Property (which shall mean, if the Leased Property is not a separate tax parcel, such portion as jointly agreed of the taxes payable with respect to the land and improvements contained in the tax parcel of which the Leased Property is a part). Lessee shall also pay as Additional Rent all taxes, fees, or charges imposed upon the conduct of Lessee's business or upon the use, transfer, or possession of all equipment, fixtures, inventory, merchandise or other property of Lessee. Lessee, at its sole cost and expense, but with the cooperation of Lessor if reasonably necessary, will obtain and keep in full force and effect, or cause to be obtained and kept in full force and effect, whatever governmental or regulatory approvals, consents, authorizations and/or licenses, if any, with respect to the ownership, occupation or use of the Leased Property, which may be required of Lessee, Lessor or any other party having any interest in the Leased Property or the occupancy or use thereof. Except for matters as to which Lessor is specifically to be responsible as set forth in Section 16, Lessee, at its sole cost and expense, shall also take such other actions as may be necessary to cause the Leased Premises and its use to comply with all applicable laws, rules, regulations, ordinances, restrictions and insurance policies, now or hereafter in effect, and all agreements to which Lessee is bound and which are now or hereafter in effect.

7. Maintenance and Repair. Lessee, at its sole cost and expense, will maintain all parts of the Leased Property in a state of repair and condition such that no liability shall

accrue to Lessor as a result of the condition of the Leased Property and Lessor shall not be required to maintain, repair, service, restore, replace, or rebuild all or any part of the Leased Property.

8. Condemnation and Casualty. (a) If any part of the Leased Property shall be taken for any public or quasi-public use under any statute or by right of eminent domain or by private purchase in lieu thereof (any such taking or purchase is hereinafter referred to as "Condemnation"), then Lessee shall be entitled to receive any condemnation award so received and to control such proceedings. If a Condemnation of part of the Leased Property occurs, then this Lease shall continue on all the same terms and conditions except that the definition of Leased Property will be changed to reflect the effect of the Condemnation. Lessee shall have the right to claim and recover from the condemning authority, but not from the Lessor, any proceeds of any award resulting from a Condemnation.

(b) If the Leased Property is damaged or destroyed by fire, flood or other casualty (any of which occurrences is hereinafter referred to as "Casualty"), Lessee shall be entitled to receive the proceeds of any insurance the premiums of which have been paid for by Lessee resulting from the Casualty in question. Lessee, at its sole cost and election, shall either (i), restore the Leased Premises to their condition immediately prior to the Casualty to the extent reasonably possible, or (ii) remove all damaged Improvements and Equipment and restore the Land, if damaged by such removal or the Casualty, to an environmentally clean, safe, and usable condition; provided that such restoration or removal obligation shall not apply if Lessee exercises its purchase option contained in Section 10(a), and provided further, in the absence of an environmental or safety hazard, such restoration or removal election may be deferred by Lessee until the termination of the Lease.

9. Insurance. (a) At all times during the term of this Lease, Lessee shall purchase and maintain insurance in the types and amounts required by applicable laws and regulations, but shall at a minimum carry the following coverages with companies acceptable to Lessor:

(i) (At Lessee's option) All-Risk Physical Damage Insurance covering all Leased Property with limits determined by Lessee. Lessor shall be named as an additional loss payee under any such insurance, but any proceeds shall be available to cover costs incurred by Lessee under Section 8 (b).

(ii) Worker's Compensation Insurance covering all employees to comply with the laws of the State of Oklahoma and Employer's Liability Insurance with a limit of not less than $500,000.

(iii) General Liability Insurance covering all claims for bodily injury, death or property damage occurring on, in or about the Leased Premises and adjoining streets and sidewalks with a combined single limit of not less than $1,000,000 each occurrence. The policy shall include, but not be limited to, Products and Completed Operations, Broad Form Property Damage and Blanket Contractual Liability

Coverage. The policy shall also include coverage for the explosion (X), collapse (C) and underground (U) hazards, if applicable.

(iv) Automobile Liability Insurance covering all automotive equipment (whether owned, non-owned or hired) with a combined single limit of not less than $1,000,000 each accident for bodily injury and/or property damage.

(v) Umbrella Liability Insurance to total $10,000,000 when combined separately with each of the limits in (iii) and (iv) above.

(b) The policies specified in (a)(ii) above and any insurance Lessee carries on it equipment shall be endorsed to waive rights of subrogation against Lessor. The policies specified in (a)(iii) through (a)(v) above shall be endorsed to include Lessor as an additional insured. All policies above shall be primary to policies purchased and maintained by Lessor.

(c) Lessee shall furnish Lessor with an insurance certificate as evidence of the above coverages and requirements and containing the following statement:

> "Thirty (30) days' prior written notice will be given to Kerr-McGee Corporation in the event of cancellation or material change in coverage."

(d) The consent of Lessor to the amounts of insurance specified in this Exhibit shall not be considered as a limitation of Lessee's liability under this Lease nor an agreement by Lessor to assume liability in excess of said amounts or for risks not insured against.

10. Purchase. (a) Lessee shall have the option during the Term to purchase the Leased Property at any time during the Term for a purchase price of One Dollar ($1.00), provided that such exercise and purchase do not violate the requirements of the Consent Order or applicable NRC regulations and the NRC has released the Leased Property for use for unrestricted purposes (the foregoing conditions being referred to as the "Transfer Conditions"). Lessor shall use its reasonable efforts to cause the Transfer Conditions to be met prior to the end of the initial Term hereof. At such time during the Term as Lessor has determined that the Transfer Conditions have been met, it shall give notice thereof to Lessee (the "Availability Notice"). Such option must be exercised by Lessee, if at all, by notice to Lessor given within thirty (30) days after delivery to Lessee by Lessor of the Availability Notice. If Lessee exercises such option, Lessor shall sell to Lessee, and Lessee shall purchase from Lessor, the Leased Property within thirty (30) days after the date Lessee exercises its option to purchase (but not later than the expiration of the Term), on a date designated by Lessee with at least five (5) days' notice to Lessor (but in any event occurring by the end of the Term). To effect such purchase and sale, a Deed and Bill of Sale conveying the Leased Property to Lessee, in the forms attached hereto as Schedule B and Schedule C, respectively, will be delivered to the Lessee. Lessee shall pay all charges incident to closing the purchase of the Leased Property. Upon the completion of any purchase of the Leased Property by Lessee, this Lease shall terminate.

(b) If the Availability Notice has not been given to Lessee by five (5) days prior to the end of the Term, the Term shall be automatically extended for an additional five (5) years commencing on the first day after the date this Lease would otherwise expire. So long as the Availability Notice shall not have been given, the Term shall continue to be so extended for additional successive periods of five years each in accordance with the preceding sentence.

(c) Lessee shall afford Lessor and its agents such access to the Leased Property and records of Lessee as shall be reasonably necessary or appropriate for purposes of compliance by Lessor with the obligations for which it has agreed to be responsible pursuant to Section 16 hereof. Lessee shall not use, or engage in any activities at, the Leased Property in any way inconsistent with, or which causes a violation of, the Consent Order, the NRC License, or any law, rule or regulation compliance with which Lessor is responsible by reason of its covenants contained in Section 16 hereof. The foregoing shall be incorporated in substance into the deed to be delivered to Lessee at the closing of the purchase and sale contemplated in this Section 10 if Lessor has not fully completed all remediation and other requirements of the Consent Order, the NRC License Agreement or related NRC rules or regulations applicable thereto.

11. Subletting and Assignment. Lessee will not sublet the Leased Property or any portion thereof, or assign its interest in this Lease, without the prior written consent of Lessor in each instance (which consent will not be unreasonably withheld). If consented to, each sublease or assignment shall expressly be made subject to the provisions hereof. No such sublease or assignment shall modify any obligation of Lessee hereunder, which obligations shall continue in full force and effect as obligations of Lessee as a principal and not as a guarantor or surety, as though no subletting or assignment had been made.

12. Default Provisions. (a) Any of the following occurrences or acts shall constitute an event of default (an "Event of Default") under this Lease: (i) if Lessee shall (A) fail to pay any Additional Rent or other sum required to be paid by Lessee hereunder when due and such failure shall continue for ten (10) days after written notice of such failure; or (B) fail to observe or perform any other provision hereof or contained in any other agreement, certificate, instrument, or other document executed by Lessee in connection with this Lease for the benefit of either Lessor or any mortgagee, and such failure to observe or perform shall continue for thirty (30) days after written notice to Lessee of such failure (provided, however, that in the case of any such default which cannot be cured by the payment of money and cannot with diligence be cured within such thirty (30) day period, if Lessee shall commence promptly to cure the same and thereafter prosecute the curing thereof with diligence, the time within which such default may be cured shall be extended for such period as is reasonably necessary to complete curing thereof with diligence); (ii) if Lessee shall commence a voluntary case under the federal Bankruptcy Code, shall file a petition in bankruptcy or for reorganization or for an arrangement pursuant to any federal or state bankruptcy law or any similar federal or state law, shall be adjudicated a bankrupt or become insolvent, shall not generally pay its debts as they become due, shall make an assignment for the benefit of creditors, or shall admit in writing its

inability to pay its debts generally as they become due, or if a petition or answer proposing the adjudication of Lessee as a bankrupt or its reorganization pursuant to any federal or state bankruptcy law or any similar federal or state law shall be filed in any court and Lessee shall consent to or acquiesce in the filing thereof or such petition or answer shall not be discharged or denied within ninety (90) days after the filing thereof; (iii) if a receiver, trustee or liquidator of Lessee or of all or substantially all of the assets of Lessee or of the Leased Property or Lessee's estate therein shall be appointed in any proceeding brought by Lessee, as the case may be, or if any such receiver, trustee or liquidator shall be appointed in any proceeding brought against Lessee and shall not be discharged within ninety (90) days after such appointment, or if Lessee shall consent to or acquiesce in such appointment; or (iv) if a custodian for purposes of any federal or state bankruptcy law or any similar federal or state law is appointed or otherwise takes possession of a substantial portion of Lessee's assets and such custodian is not discharged within ninety (90) days.

(b) If an Event of Default has occurred hereunder and is continuing, Lessor may, in addition to all other rights and elections provided in this Lease and all other legal and equitable remedies available to Lessor, give Lessee notice of Lessor's termination of this Lease. Upon the giving of such notice, this Lease shall expire and terminate on such date as fully and completely and with the same effect as if such date were the date herein fixed for the expiration of the Term of this Lease, and all rights of Lessee hereunder shall expire and terminate, but Lessee shall remain liable as provided in this Lease.

13. Notice. All notices, consents, and other communications given pursuant to this Lease shall be in writing. Any such notice or communication shall become effective when received if sent in the mails, certified or registered with appropriate postage prepaid, or delivered by hand or if sent by telecopy, telex, telegram, cable, or similar device, and shall be directed if to Lessee or Lessor, to the respective addresses set forth below their names on the signature page of this Lease. Lessor and Lessee each may from time to time specify, by giving written notice to the other, (i) any other address in the United States for purposes of this Lease and (ii) any other person or entity that is to receive copies of notices, consents, and other communications hereunder.

In the event that either Lessee or Lessor refuse attempted delivery via (i) certified or registered mail, or (ii) telex, telegram, cable, or similar device, then notice shall be deemed to have been given upon the date of attempted delivery, provided, however, that such refusal of delivery shall be evidenced by either a United States Postal Service slip or a stamped transmission slip to such effect issued by the entity operating the transmitting facility.

14. Headings. The headings of the various sections and Schedules of this Lease have been inserted for reference only and shall not to any extent have the effect of modifying, amending or changing the expressed terms and provisions of this Lease.

15. Enforceability. (a) Each provision hereof shall be separate and independent and the breach of any such provision by Lessor shall not discharge or relieve Lessee from its obligations to perform each and every covenant to be performed by Lessee hereunder.

(b) All provisions contained in this Lease shall be binding upon, inure to the benefit of, and be enforceable by, the respective successors and permitted assigns of Lessor and Lessee to the same extent as if each such successor and assign were named as a party hereto.

(c) This Lease may not be changed, modified or discharged except by a writing signed by Lessor and Lessee. Any such change, modification or discharge made otherwise than as expressly permitted by this paragraph shall be void.

16. Incorporation of Certain Terms; No Warranties. Lessor shall comply at its sole expense with all requirements of the Consent Order and of the NRC License. With these exceptions, the provisions of Sections 8.1 and 8.3 of that certain Stock Purchase Agreement ("Stock Purchase Agreement") of even date herewith executed by and between Lessor as Seller and NGC Oil and Trading Transportation, Inc. as Purchaser are acknowledged by the parties to include within their scope the Leased Premises and the business and activities conducted thereon, and they and the other provisions of said Stock Purchase Agreement which relate to them are accordingly specifically incorporated herein by reference as fully as if set forth in full. LESSOR MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE LEASED PREMISES OR ANY MATTERS PERTAINING TO THE SUBJECT MATTER OF THIS LEASE, INCLUDING WITHOUT LIMITATION REPRESENTATIONS CONCERNING HABITABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OTHER THAN THOSE EXPRESSLY SET FORTH HEREIN OR IN THE STOCK PURCHASE AGREEMENT.

17. Existing Terminalling Agreement. This Lease and Lessee's rights hereunder are subject to that certain Terminalling Agreement dated January 23, 1976 between Kerr-McGee Refining Corporation and Oklahoma State University of Stillwater, Oklahoma, as it may have been modified and extended from time to time.

18. Right to Use Existing Road. In connection with this Lease, Lessee shall have the rights of reasonable ingress and egress to the existing tank on Tract 4 as described on Schedule A hereto, across the existing road to such tank that extends northward from Tract 4 and then easterly to Linwood Road. Such rights of ingress and egress shall continue so long as Lessor maintains said road until Lessor terminates said rights upon not less than four months written notice to Lessee.

19. Dual-Use Agreement. (a) Lessor has heretofore used that certain property consisting to the land described in Schedule A-1 ("Dual-Use Land") and the principal building situated on the Dual-Use Land ("Dual-Use Building") on a shared basis with KMRC. Lessor primarily uses the Dual-Use Land, including certain movable buildings on the Dual-Use Land, and approximately one-half of the Dual-Use Building in connection with its remediation activities ("Remediation"). KMRC has used the remainder of the Dual-Use Building for offices in connection with pipeline and tank farm activities.

(b) Lessor hereby grants to Lessee the right to use the portions of the Dual-Use Building heretofore being used by KMRC and grants to Lessee the rights of ingress and egress upon the Dual-Use Land that are reasonably necessary to such use. Lessor retains the right to continue to use the remainder to the Dual-Use Building and the Dual-Use Land, including any necessary right of ingress and egress through the portion of the Dual-Use Building used by Lessee. Subject to the right of either party to terminate the Dual-Use Agreement as provided hereinafter, the term of this Dual-Use Agreement shall be coterminous with the longer to survive of this Lease Agreement or the Lease Agreement covering the Cleveland, Oklahoma property.

(c) While Lessor remains in possession of the Dual-Use Building, Lessor will maintain all parts of the Dual-Use Building not occupied by Lessee in a state of repair and condition such that no liability shall accrue to either Lessor or Lessee as a result of the condition of the Dual-Use Building and Lessee will so maintain the portion(s) occupied by it. However, except as so provided, neither Lessor nor Lessee shall have any obligation to repair, restore, replace or rebuild all or any part of the Dual-Use Building if it concludes that such repair, restoration, replacement or rebuilding is not economically justified. From time-to-time Lessor and Lessee shall agree on a reasonable method for allocating utility costs, routine maintenance costs and other costs applicable to the dual use and Lessee shall pay such agreed portion of such costs promptly upon invoice. If Lessor and Lessee are unable to reach any such agreement, either party shall have the right to terminate this Dual-Use Agreement upon 30 days advance written notice. If the Dual-Use Agreement is so terminated by either party, Lessee shall vacate the premises prior to the end of the notice period.

(d) Upon the later of termination of this Lease Agreement or of the Lease Agreement covering the Cleveland, Oklahoma property, or earlier, at Lessor's election, upon notice to Lessee, Lessee shall have the option to purchase (i) the Dual-Use Land, the Dual-Use Building, any and all permanent fixtures and improvements now or hereafter located on the Dual-Use Land (not including any movable buildings or equipment now or hereafter used or held for use by Lessor in connection with Remediation, which shall remain the property of Lessor); (ii) any easements, rights and appurtenances relating to the Dual-Use Land, Dual-Use Building, and improvements; and (iii) any furniture and equipment heretofore being used by KMRC in its pipeline and tank farm activities, the use of which is continued by Lessee under this Dual-Use Agreement (but not including any machinery, equipment, furniture or other tangible personal property now or hereafter used or held for use by Lessor in connection with Remediation, which shall remain the property or Lessor), all of which Dual-Use Land, Dual-Use Building, and described fixtures, improvements, easements, rights, appurtenances, furniture and equipment being hereinafter sometimes collectively referred to as the "Dual-Use Property". The purchase price provided in Section 10 of this Lease Agreement shall apply to the purchase of the Dual-Use Property.

(e) The provisions of Sections 8, 9, 10, 11, 12, 13, 14, 15, and 16 of this Lease Agreement shall apply to the Dual-Use Property, as if the Dual-Use Property were included in the definition of Leased Property, provided, however that the deed and bill of sale applicable to the Dual-Use Property shall be prepared at the time of the purchase of

the Dual-Use Property by Lessee, and shall generally conform to the form of Schedules B and C of this Lease Agreement, revised as necessary to reflect the distinctions between Dual-Use Property and Leased Property.

(f) During the term of this Dual-Use Agreement, Lessor shall pay all real estate taxes assessed or levied against the Dual-Use Property, and against Lessor's retained movable buildings, equipment, and furniture. Lessee shall bear and pay any taxes assessed or levied against Lessee's separate property and shall reimburse Lessor to the extent agreed upon as a cost pursuant to paragraph (c) of this Section 18, for any portion of any tax allocable to Lessee's use or allocated portion of the Dual-Use Property.

20. Governing Law. This Lease shall be governed by and interpreted in accordance with the laws of the State of Oklahoma.

IN WITNESS WHEREOF, the Lessor and Lessee have caused this Lease to be executed by their respective signatories thereunto duly authorized.

KERR-McGEE CORPORATION,
Lessor

By: [signature]
Name: R. C. HORNER
Title: V-P

123 Robert S. Kerr Avenue
Oklahoma City, Oklahoma 73102
Attention: President

NOTTI GATHERING COMPANY, INC.
Lessee

By: [signature]
Name: WAYNE C. BARTEL
Title: V.P. & GEN MGR

13430 Northwest Freeway, Suite 1200
Houston, Texas 77040
Attn: Vice President + General Manager
Telecopy No: 713-507-6575

Attachments:

| | | |
|---|---|---|
| Schedule A | - | Description of Land |
| Schedule A-1 | - | Tract Five |
| Schedule B | - | Form of Deed |
| Schedule C | - | Form of Bill of Sale |

# SCHEDULE A
# TO
# LEASE AGREEMENT

Tract 1

NE/4 of the SE/4 and East 1 Rod of the NW/4 of the SE/4 of Section 27-T18N-R5E containing 40.5 acres more or less;

LESS AND EXCEPT a tract of land containing 1 acre, more or less, described as follows: Beginning at a 1/2 inch steel rod in the East line of said Section 27, 1320 feet North of the Southeast corner of said Section; thence West a distance of 208.7 feet to a 1/2 inch steel rod; thence North a distance of 208.7 feet to a 1/2 inch steel rod; thence East a distance of 208.7 feet to a 1/2 inch steel rod in the East line of said Section 27; thence South along said East line a distance of 208.7 feet to the point of beginning;

LESS AND EXCEPT all oil, gas and other minerals previously conveyed or reserved of record.

Tract 2

From point of beginning at the SE Corner of NE/4 of Section 27-T18N-R5E North 695.6 feet; thence west 414.0 feet; thence south 334.4 feet; thence west 978.7 feet; thence south 361.2 feet; thence east 1,392.7 feet to point of beginning containing 14.7 acres more or less.

LESS AND EXCEPT all oil, gas and other minerals previously conveyed or reserved of record.

Tract 3

Beginning at the SW Corner of the SE/4 of Section 22-T18N-R5E; thence east 359.6 feet to the point of beginning; thence north 935.5 feet; thence west 840.6 feet; thence south 935.5 feet; thence east 840.6 feet to the point of beginning containing 18.1 acres more or less.

LESS AND EXCEPT all oil, gas and other minerals previously conveyed or reserved of record.

Tract 4

Tract of land utilized for the 55M barrel tank purchased from Southwest, which is described as follows:

From the point of beginning on the east line of Section 27-T18N-R5E, 695.6 feet north of the southeast corner of the northeast quarter of said Section; thence north a distance of 200 feet; thence west a distance of 650 feet; thence south a distance of 534.4 feet; thence east a distance of 236 feet; thence north a distance of 334.4 feet; then east a distance of 414 feet to the point of beginning containing 4.8 acres more or less.

LESS AND EXCEPT all oil, gas and other minerals previously conveyed or reserved of record.

SCHEDULE A-1
TO
LEASE AGREEMENT

Tract Five

A tract of land in the NE/4 of Section 27, Township 18 North, Range 5 East of the Indian Meridian, described as follows; beginning at the northwest corner of the NE/4 of said Section 27; thence east along the north line of said Section 27, 702 feet to the west right-of-way line of the A.T.&S.F. Railroad; thence southwesterly along said railroad right-of-way 837 feet to the west line of said NE/4; thence north along the west line of said NE/4, 456 feet to the point of beginning.

LESS AND EXCEPT all oil, gas and other minerals previously conveyed or reserved of record.

SCHEDULE B
TO
LEASE AGREEMENT

DEED

THIS INDENTURE, made as of the ____ day of ______________, 19___, between KERR-McGEE CORPORATION, a Delaware corporation, with its principal offices at 123 Robert S. Kerr Avenue, City of Oklahoma City, County of Oklahoma, State of Oklahoma, party of the first part; and NOTTI GATHERING COMPANY, INC., a Delaware corporation with its principal offices at ______________________________________, party of the second part.

WITNESSETH:

That the said party of the first part has granted and conveyed and by these presents does grant and convey unto the said party of the second part, and to its successors and assigns, forever;

ALL those tracts or parcels of land and premises, situate, lying and being in the City of Cushing, County of Payne and State of Oklahoma, hereinafter particularly described in Exhibit A annexed hereto and incorporated herein by reference;

TOGETHER with all and singular the fixtures, improvements, ways, waters, profits, privileges and advantages, with the appurtenances to the same belonging or in anywise appertaining;

ALSO, all the estate, right, title, interest, property, claim and demand whatsoever, of the said party of the first part, of, in and to the same, and of, in and to every part and parcel thereof;

SUBJECT to all oil, gas and other minerals previously conveyed or reserved of record, mortgages, security interests, liens, claims, easements, rights-of-way and other encumbrances shown of record or which may be revealed by an accurate survey or inspection of the premises (all such items to which this conveyance is subject are herein called "Encumbrances");

[*Exempt from documentary stamp tax (68 O.S. § 3201) due to consideration being nominal or less than one hundred dollars ($100.00)*]

TO HAVE AND TO HOLD all and singular the above-described land and premises, with the appurtenances, unto the said party of the second part, its successors and assigns, to the only proper use, benefit and behoof of the said party of the second part, its successors and assigns, forever.

THIS INSTRUMENT HEREBY CONVEYS AND GRANTS THE ABOVE-DESCRIBED LAND AND PREMISES AND APPURTENANCES THEREOF (THE "PROPERTY"), IN "AS IS, WHERE IS" CONDITION, WITHOUT WARRANTIES OF ANY LIMITATION, ANY IMPLIED WARRANTY OF TITLE, MERCHANTABILITY, HABITABILITY, SUITABILITY OR FITNESS FOR USE OR A PARTICULAR PURPOSE.

IN WITNESS WHEREOF, the party of the first part has set its hand and seal or cause these presents to be signed by its proper corporate officers and causes its proper corporate seal to be hereunto affixed, the day and year first above written.

ATTEST: KERR-McGEE CORPORATION

_______________________ By:_______________________

Assistant Secretary

Name:_______________________ Name:_______________________

Its:_______________________

Attachment:

Exhibit A - Property Description

STATE OF OKLAHOMA §
§
COUNTY OF OKLAHOMA §

The foregoing instrument was acknowledged before me this _____ day of ____________, 19___, by _______________________, President of KERR-McGEE CORPORATION, a Delaware corporation, on behalf of the corporation.

_______________________
Notary Public

My Commission Expires:

_______________________

SCHEDULE C
TO
LEASE AGREEMENT

# BILL OF SALE

THIS BILL OF SALE (the "Bill of Sale") is executed and delivered by KERR-McGEE CORPORATION, a Delaware corporation ("Transferor"), to NOTTI GATHERING COMPANY, INC., a Delaware corporation ("Transferee") having an address at ______________________________, as of the _____ day of ________________, 199___.

WITNESSETH:

WHEREAS, concurrently with the execution and delivery hereof, Transferor is conveying to the Transferee by Deed, certain land located in Payne County, Oklahoma, and being more particularly described on Exhibit A, which is attached hereto and made a part hereof for all purposes, together with any and all buildings, improvements and fixtures thereon (said land and the buildings, improvements and fixtures thereon being herein referred to as the "Real Property"); and

WHEREAS, it is the desire of Transferor to hereby assign, transfer, and convey to Transferee all machinery, equipment, furniture and other tangible personal property constituting fixed assets of the Transferor which are presently located on the Real Property and owned by the Transferor (all of such tangible personal properties and assets being collectively called the "Personal Property").

NOW, THEREFORE, for and in consideration of the premises, and of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration in hand paid by Transferee to Transferor, the receipt and sufficiency of which are hereby acknowledged and confessed by Transferor, Transferor does hereby ASSIGN, TRANSFER, SET OVER, DELIVER, and CONVEY to Transferee, its successors and assigns, all of the Personal Property subject, however, to all mortgages, security interests, liens, claims, easements, rights-of-way and other encumbrances shown of record (all such items to which this transfer is subject are herein called "Encumbrances").

TO HAVE AND TO HOLD, all and singular, the Personal Property unto Transferee, its successors and assigns, forever.

THIS BILL OF SALE HEREBY CONVEYS THE PERSONAL PROPERTY, AND THE TRANSFEREE HEREBY ACCEPTS THE PERSONAL PROPERTY, IN "AS IS, WHERE IS" CONDITION, WITHOUT WARRANTIES OF ANY KIND

WHATSOEVER BEING MADE HEREBY, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF TITLE, MERCHANTABILITY, SUITABILITY OR FITNESS FOR USE OR A PARTICULAR PURPOSE.

IN WITNESS WHEREOF, Transferor has caused this Bill of Sale to be executed effective as of the date and year first written above.

KERR-McGEE CORPORATION

By:______________________________
Its:_____________________________

STATE OF __________ §
§ SS.:
COUNTY OF _________ §

The foregoing instrument was acknowledged before me this ____ day of _________________, 199__, by _________________, as ____________________ of Kerr-McGee Corporation, a Delaware corporation, on behalf of the corporation.

Witness my hand and official seal

________________________________
Notary Public

My commission expires:_________________