Case 1:05-cv-00005-MMS Document 37-3 Filed 02/07/2007 Page 1 of 28

# PUBLIC HEALTH ASSESSMENT

## KERR-MCGEE REFINERY SITE
## CUSHING, PAYNE COUNTY, OKLAHOMA
CERCLIS NO. OKD980620934

Prepared by

The Agency for Toxic Substances and Disease Registry
and
Oak Ridge National Laboratory

## TABLE OF CONTENTS

SUMMARY

BACKGROUND

- A. Site Description and History
- B. Site Visit
- C. Demographics, Land Use, and Natural Resources
- D. Health Outcome Data

COMMUNITY HEALTH CONCERNS

ENVIRONMENTAL CONTAMINATION AND OTHER HAZARDS

- A. On-Site and Off-Site Contamination
- B. Key Contaminants
- C. Quality Assurance and Quality Control
- D. Physical and Other Hazards

PATHWAYS ANALYSES

- A. Completed and Potential Exposure Pathways Identified
- B. Key Exposure Pathways

PUBLIC HEALTH IMPLICATIONS

- A. Toxicological Evaluation
- B. Radiological Evaluation
- C. Health Outcome Data Evaluation
- D. Community Health Concerns Evaluation

CONCLUSIONS

RECOMMENDATIONS

EXHIBIT
tabbies
1

A. Reduce Exposure Recommendations
B. Characterization Recommendations

HEALTH FOLLOW-UP RECOMMENDATIONS

PUBLIC HEALTH ACTION PLAN

PREPARERS OF REPORT

REFERENCES

APPENDICES

Appendix A--Site Map
Appendix B--Thorium or Uranium Wastes Disposition
Appendix C--Investigations and Contaminant Tables
A. On-site Investigation Data
Waste Material
Soil
Sediment
Groundwater - Monitoring Wells
Surface Water
Air
Environmental/Dosimeter
B. Off-site Investigation Data
Sludge
Soil
Sediment
Groundwater - Public Wells
Groundwater - Private Wells
Surface Water
C. Contaminant Data Tables
List of Contaminant Tables
Appendix D--Pathway Tables
List of Tables
Appendix E--Overview of Radioactivity and Health
Appendix F--Health Outcome Data
Appendix G--Public Comments

**Next Section**

# PUBLIC HEALTH ASSESSMENT

## KERR-MCGEE REFINERY SITE
## CUSHING, PAYNE COUNTY, OKLAHOMA

## SUMMARY

The site, a former petroleum refinery, encompasses approximately 440 acres and is located approximately 2 miles north of Cushing, Oklahoma in Payne County. The Cushing area once had been a center of extensive petroleum production and refining; petroleum production, storage, and pipeline activities continue in the general area. The refinery, for a time, also processed nuclear materials for Atomic Energy Commission use in some of its buildings along Deep Rock Road. Kerr-McGee, the last operator of the refinery, has conducted extensive contamination investigations at the site and some substantive removals. More such activities are being planned. Kerr-McGee has entered into an agreement with the State of Oklahoma to remediate the site, and the residual impacts from the nuclear activities are being addressed under a new license with the Nuclear Regulatory Commission.

A large tract of land east of Linwood Avenue (designated Property A for this assessment and known locally as the Rafferty property) had been used for petroleum refining and storage, and once was thought by agencies to have been part of Kerr-McGee's operations. More recently, it has been determined that that Property A was never associated with the Kerr-McGee site. Another corporation will conduct detailed investigations of Property A and will initiate appropriate follow up activities. The Oklahoma Department of Environmental Quality recently named the property the Sinclair Topping Plant. The limited early information available about Property A has been addressed in this public health assessment because of it's proximity to the Kerr-McGee site and the associated community population of interest.

The Kerr-McGee site does not currently present a health hazard to the public. However if Kerr-McGee does not complete planned remedial activities, and the property is later developed for residential use, residents could be exposed in the future to contaminants and radioactive materials that might harm their health.

Property A, which is not associated with the Kerr-McGee site, is an indeterminate public health hazard because sufficient chemical and radiological data are not currently available to adequately evaluate environmental media. Lead contaminated soil and sediment were found on the property; the extent of such contamination, which is not known at this time, will determine whether or not those media are a public health threat.

## BACKGROUND

The Kerr-McGee Cushing Refinery site was proposed by the U.S. Environmental Protection Agency (EPA) for addition (Update No. 10) to the National Priorities List (NPL) in October of 1989. EPA subsequently deleted the site (Update 11). In May 1990, Kerr-McGee entered into a Consent Order with the Oklahoma State Department of Health (OSDH) that addresses investigation and remediation. In 1993, the site was put under new Nuclear Regulatory Commission (NRC) license for the purpose of addressing and remediating the residual radiological impacts. The background information that follows focuses on issues that the Agency for Toxic Substances and Disease Registry (ATSDR)

believes are the most pertinent to evaluating public health significance.

### A. Site Description and History

## General Background

Kerr-McGee Site

The site, a former petroleum refinery, encompasses approximately 440 acres and is located approximately 2 miles north of Cushing, Oklahoma in Payne County (Figure 1, Appendix A: on Page 33). The Cushing area once had been a center of extensive petroleum production and refining; petroleum production, storage, and pipeline activities continue in the general area.

The Kerr-McGee site is west of Linwood Avenue, and is divided by Deep Rock Road, which runs east-west. Several different owners had operated a refinery on the property starting about 1915. Kerr-McGee purchased the refinery in 1956 and operated it until 1972; they then dismantled refining facilities and many of the storage tanks. Most of the refining structures were located south of Deep Rock Road, on the eastern part of the site. NGC Inc. has an agreement with Kerr-McGee under which they continue to operate a few petroleum storage tanks on the property and a pipeline (1). Between 1963 and 1966, Kerr-McGee also processed nuclear materials in some refinery buildings located along the south side of Deep Rock Road; portions of those facilities have been dismantled (2) .

Kerr-McGee once sold parts of the site, and, more recently, has repurchased properties. Kerr-McGee advised ATSDR that as of early 1996 there were three small parcels within the site boundary that Kerr-McGee does not own--a parcel of about 1 acre on the southern edge of Deep Rock Road that has two active cement silos, about 1 acre on the northern edge of Deep Rock Road that has an inactive oil reclaiming facility, and about 1 acre in the southeast corner of the site that has a small inactive tank. About 1990, four residences were removed from the property (one was located along Deep Rock Road and three were along Linwood Ave, immediately south of Skull Creek). The site now is enclosed by a three-to-four strand wire fence and posted. Kerr-McGee staff report that recreational activities are not permitted on the property.

Kerr-McGee has conducted extensive contamination investigations at the site and some removals. More such activities are being planned. ATSDR has considered key elements of those activities in this public health assessment.

Property A (locally known as Rafferty property)

When proposing the Kerr-McGee site for the NPL, EPA believed a large tract of land east of Linwood Avenue that once had been used for petroleum refining and storage also had been part of Kerr-McGee's operations--see Property A on Figure 1. More recently, it has been determined that Property A was never associated with the Kerr-McGee site. The limited early information available about Property A has been addressed in this public health assessment because of it's proximity to the Kerr-McGee site and the community population of interest.

Records indicate that refinery operations stopped prior to 1956 (3). Oklahoma Department of Environmental Quality (ODEQ) staff report to ATSDR that another corporation will conduct detailed investigations of Property A and will initiate whatever follow up activities are deemed appropriate. The ODEQ recently named the property the Sinclair Topping Plant. Only a few samples have been

taken of environmental media on Property A to date. ATSDR has used the limited early investigation data to qualitatively evaluate Property A and develop general recommendations that may influence investigations of that property.

**Former Site Operations and Waste Disposal**

Petroleum Facilities

Petroleum refining, storage, and transport activities have been conducted at the site by multiple owner companies. Refining processes changed as technology advanced. Prior to 1951, a sulfuric acid treating unit was used to process lubricating oil. That unit produced waste diatomaceous earth and clay filtering materials containing entrained sulfuric acid and hydrocarbons (4). Those wastes (sludges, etc.) were deposited in five unlined pits (Pit 1 through 5) on the property. Pits 1 through 4 are located north of Deep Rock Road, while Pit 5 is located south of the road, near Skull Creek. The waste volume has been estimated to be 300,000 cubic yards, half of which is contained in Pit 5 (1,5). After 1951, a different treatment unit was installed, and production of acid wastes stopped (1). Other estimates place the amount at nearly 400,000 cubic yards. Kerr-McGee reported that Pits 1, 2, 3, and 5 were full when they purchased the refinery in 1956, and, therefore, were not used in their refinery operations. Pit 4 was used by Kerr-McGee to dispose of desalter refinery waste and waxy residues (1). The pits are surrounded by chain link fencing. In 1994, 21 additional small waste deposits containing petroleum sludge were identified and evaluated (6).

Nuclear Facilities

Uranium and thorium processing occurred between 1963 and 1966. The Atomic Energy Commission (AEC) issued Kerr-McGee a source material license (SMB-664) on November 7, 1962 and a special nuclear material license (SNM-695) on April 23, 1963 (7). Uranium processing wastes included carbon crucibles, high efficiency particulate air (HEPA) filters, magnesium fluoride, and calcium fluoride. Disposal methods for the carbon crucibles and HEPA filters are uncertain. Magnesium fluoride, a byproduct of the processing activities, disposal also is uncertain, but it may have been returned to the AEC because it contained trace uranium impurities. Calcium fluoride was transported to Kerr-McGee's Cimarron Facility in Crescent, Oklahoma for processing to recover the remaining chemically enriched uranium. For thorium processing, wash water and nitric acid pickling solution were the only known wastes. Wash water that did not meet unrestricted release criteria was discharged on a hill at the northeast corner of the Kerr-McGee property and allowed to percolate into the soil or to flow overland to Pit 4. The pickling solution was recycled (4).

**Post Operations Investigations, Removals, Disposal, and Improvements Thru 1995**

A new fence has been placed around the entire Kerr-McGee property, and additional chain link fencing with barbed wire on top has been erected around the pits. Kerr-McGee is further restricting access to the area by refusing to grant permission for recreational use of the property, and by clearing brushy areas that would inhibit visual observation of trespassers in remote areas (8). Kerr-McGee has advised ATSDR that dust control measures have been an integral part of remediation activities.

Oil Refinery-Related Materials

Several site investigations have been performed since 1986 by EPA, Kerr-McGee--or their associated contractors, and state and local agencies to evaluate whether chemical contamination is present. Those

investigations have focused on groundwater and conditions around the five disposal pits, drainage courses associated with the pits, and Skull Creek. Samples have been obtained on site of waste hydrocarbon sludges and tars, soils, sediments, groundwater, and surface water. Off-site, less extensive sampling has been undertaken of soils, public well water, private well water, pond water, and creek water and sediments.

When operations ceased, refinery facilities and many of the tanks on the site were demolished. Much material that was reusable was removed from the site. The remainder was buried and covered at numerous locations on the property. Several more recent (1990 to present) remedial activities have been conducted specifically to limit access to, or transport of, potentially hazardous contaminants. These activities include rerouting Skull Creek away from Pit 5 and installing underground collection systems on both sides of the creek to intercept and remove oily and acidic seepage. Berms and ditches around Pits 1, 2, 3, and 5 have been renovated, and pit runoff is held and neutralized before discharge. Asbestos wastes have been buried (9). Kerr-McGee reported to ATSDR staff that the former spray and oil trap ponds near Pit 5 also have been remediated in accordance with state oversight and authorization. Contaminated soils and sludges found at those ponds were deposited in Pit 5; other soils encountered were spread and tilled into natural soils at four different areas of the site.

Radiological-Related Materials

Several investigations have been performed since 1966 principally by Kerr-McGee--or their associated contractors to evaluate the locations and levels of radioactivity. The investigations have focused on the Kerr-McGee property; some off-site media also have been surveyed.

In 1966, Kerr-McGee requested termination of its Atomic Energy Commission (AEC) licenses, and clean-up and decontamination were conducted in accordance with then-existing guidelines. Some of the waste generated during the decommissioning was shipped to the Cimarron Facility for storage. Low-level radioactive waste was buried in trenches north of Deep Rock Road. The AEC surveyed the uranium/thorium processing buildings for radioactivity, found the results satisfactory for unrestricted use of the property, and formally terminated Kerr-McGee's uranium/thorium licenses on July 25, 1966 (7).

In 1972, Kerr-McGee resurveyed the site for radioactivity. Additional clean-up and decontamination were initiated as a result of the survey. Some low-level wastes were buried in Pit 4, and covered with 4 feet of soil. Further clean-up of the former uranium/thorium processing plant and some other parts of the property occurred from 1979 through 1982. Contaminated soil and other wastes, depending on radioactivity levels, either were shipped to approved commercial low-level disposal sites; buried on site in trenches; or managed on site using land farming techniques (i.e., spreading a thin layer of contaminated material over noncontaminated soil and deep plowing the zones together) (7).

In 1989, Kerr-McGee conducted an additional survey in the vicinity of the former nuclear processing facilities to determine whether radiation levels met then current regulatory guidelines. Surface areas, soils, and sediments were evaluated using alpha and gamma radiation-detecting instruments. Kerr-McGee reviewed the survey results and identified some clean-up actions (10). Those activities resulted in relicencing the facility under NRC jurisdiction for purposes of completing the remediation under a formal NRC newly instituted program.

A site-wide radiological characterization in 1990 included a gamma survey on a 10-meter grid followed by analysis of discrete samples taken at locations where gamma levels exceeded background

(exceeded 15 microRoentgens per hour--μR/hour). That characterization disclosed that only a small portion of the overall property--mostly north of Deep Rock Road--contains substantive residual process-related radioactivity. There, deposits of elevated radiological contaminants were found within several small to large areas including Pit 4, the trash dump, several tank berms, and a pipe storage area. South of Deep Rock Road, elevated levels were primarily in the vicinity of the former nuclear processing buildings and near a segment of Skull Creek running adjacent to the buildings.(11). In 1994, further characterization was undertaken within four large areas (total about 200 acres) not expected to have been affected by licensed radioactive materials (12). The survey proved negative in those areas.

In the early 1990s, additional removals and partial decontaminations were conducted at the former nuclear processing facilities. Some small deposits were also remedied near the east boundary of Pit 5. Some of the removed materials have been drummed and shipped to a radioactive waste disposal site, and some have been temporarily stored on-site awaiting off-site licensed disposal (2).

**Current Remediation, Decommissioning, Future Use Issues**

In May 1990, Kerr-McGee entered into a Consent Order (with the then-named Oklahoma State Department of Health (OSDH)) that addressed investigation and remediation. The Consent Order divided the site work into non-radiological (i.e., chemical) and radiological activities. Remediation activities include dust control measures and monitoring to confirm that the measures are effective.

The agreement calls for non-radiological remediation planning and implementation to be performed in a manner similar to the federal Superfund remedial investigation and feasibility study process. The ODEQ issued a Record of Decision (ROD) for the five large acidic sludge pits that outlines waste neutralization, excavation, and placement in an on-site engineered disposal cell. Kerr-McGee staff recently advised that the cell is being constructed and sludge remediation has begun. Dust control measures are being implemented. All activities are to be conducted under terms of a health and safety plan designed to minimize occupational and public exposures and include on-site and property-line air monitoring (13). Hydrocarbon removals that either include radiological components or are to be conducted within the limits of defined radiologic waste areas will be coordinated with the general radiologic waste removal program. The 21 smaller hydrocarbon waste deposits identified are being addressed under planning and approvals now in place. Plans call for Phase II investigations for chemical contamination extending to areas beyond those already examined. Removal and residual contamination criteria will be developed at a later time.

Current and future radiological cleanup is being addressed under terms of a new licence and a site decommissioning plan that was submitted to the NRC for approval in 1994 and modified in 1996. These changes involve shipping of licenced, buried material to an off-site, licenced disposal facility; whereas, the 1994 plan intended construction of an on-site disposal cell to receive most of the radiological contaminants at the site. The plan includes a health physics program designed to minimize occupational and public exposures and also provides for a final site radiological survey. Soil and debris with low levels of activity satisfying Branch Technical Position (BTP) Option 1 (see Appendix B, Page 35) is to be left in place or used to fill excavations. Soil and debris containing radionuclides in excess of BTP Option 1 criteria are to be excavated, placed in containers, and shipped to a licensed disposal site.

Equipment and buildings intact and left in place will meet NRC's Guidelines for Decontamination of Facilities and Equipment Prior to Unrestricted Use or Termination of Licenses for Byproduct, Source,

or Special Nuclear Materials. Cleanup candidates include Pit 4, some refinery tank berms, trash dump, burial trenches, the abandoned and filled segment of the rerouted part of Skull Creek, additional parts of process buildings and adjacent land, some localized deposits of soil, rubble, and NORM (2) .

Kerr-McGee staff advised ATSDR representatives that it would ultimately like to release the site without restriction for any combination of residential and industrial, commercial, or recreational development. More likely, the site will be divided into portions sustaining specific future uses. Those uses consider the following:

- Residential--people living on the property,
- Industrial/commercial--business operating on the property with workers occupying the property 40 hours per week,
- Caretaker status--Kerr-McGee keeping and maintaining the property, with caretaker present one day per week, and
- Trespasser status--Kerr-McGee keeping the land; people periodically might trespass.

Investigations will be conducted to provide additional information needed for making future use decisions.

Kerr-McGee expects that the NRC will release the site for unrestricted use and development after further radiological decommissioning activities have been completed. Kerr-McGee also will evaluate different portions of the site with respect to State-approved Remedial Action Objectives (being developed--will address both chemical and radiological toxicity and any associated human health issues) and will identify which areas can be efficiently cleaned to meet specific future use scenarios.

### B. Site Visit

Representatives from ATSDR, Kerr-McGee and ODEQ met in March 1996 to discuss site issues and to tour the property. A similar visit was made in 1990. Pertinent information obtained from those visits is included in appropriate sections of this document.

### C. Demographics, Land Use, and Natural Resources

#### Demographics

Cushing, Oklahoma, the second largest city in Payne County, is located about 2 miles south of the site and has a population of approximately 7,200 residents (14). Outlying residential areas have expanded toward the site. Much of the expansion has been along Highway 18 west of the site and along Granstaff Road south of the site. ATSDR staff observed the greatest concentration of nearby residences to be in the North Drake subdivision, which is south of Deep Rock Road and extends from Highway 18 eastward and northward toward the site boundaries. The nearest residence there is close to Deep Rock Road and is about 100 feet from the site boundary; the next closest is about 400 feet away. Granstaff road, about 1,200 feet south of the southernmost site boundary, has about 3 dozen homes along the road and in a small subdivision north of the road. On the east side of the site, there are about a dozen residences across Linwood Avenue. Several are within 200 feet of the property. Linwood Avenue to the north and south of the site also has a few residences; the closest is about 200 feet north of the property. Kerr-McGee staff report that in recent times four residences had been located on the property now under their ownership. These were removed about 1990. One of them was

on Deep Rock Road near the nuclear reprocessing facilities; the others were along Linwood Avenue, a short distance south of Deep Rock Road.

Deep Rock Elementary School is located on the east side of Linwood Avenue. The superintendent of Cushing Schools reported that about 130 students in grades one through five attend the school. Most of these children ride school buses (15).

The total number of workers employed by the various oil companies that operated on the site are not known.

**Land Use**

ATSDR noted that the immediate site vicinity is largely rural; properties adjacent to the site primarily are grassland, or are used for crops and livestock, or are grown over with vegetation. Residential and school land uses are described under the preceding Demographics section. The developed areas surrounding the site are zoned industrial and residential (1). The area has scattered oil wells and oil fields in all directions from the site. Property A, east of the site, once had a refinery.

**Natural Resource Use**

Groundwater

Groundwater beneath the site and vicinity lies in three sequential zones; the overburden, the Vanoss Group, and the underlying Vamoosa-Ada aquifer. The Vamoosa-Ada aquifer provides the primary water source for the area.

The shallowest water occurs within the relatively thin zone of overburden (loose silt, sand, and gravel) that overlies bedrock (16)(17). The overburden ranges from 0 to 25 feet in depth and is characteristically saturated within 3 to 5 feet above the bedrock (18). Groundwater in that zone flows laterally along the underlying bedrock surface and discharges into nearby drainage systems (1). Little water is expected to penetrate the underlying bedrock.

Rocks comprising the Vanoss Group underly the overburden zone. The shales and mudstone in this formation are expected to have low permeability that should retard downward movement of water from the overlying overburden aquifer. However, the permeability of the Vanoss Group beneath the site has not been determined. The formation includes permeable sandstone zones through which groundwater can migrate. Sandstone zones have been noted to occur at depths as shallow as 10 to 65 feet below the ground surface. Monitoring wells extending into the sandstone zones indicate that groundwater there is under confined conditions (1) (i.e., the zone is confined between two less permeable zones) (18). Data are not available to establish rate or direction of ground-water flow within the Vanoss Group (1).

The deeper Vamoosa-Ada aquifer is the municipal groundwater source for the area. Water from this aquifer sometimes is withdrawn via wells to supplement the Cushing city water system. The overlying Vanoss Group should prevent shallow groundwater from migrating downward and recharging the deeper Vamoosa-Ada aquifer. At the site, the Vamoosa-Ada aquifer is about 200 feet below the surface. Aquifer recharge occurs where the aquifer rises to, or near, the ground surface (1) (i.e.,about 2½ miles east of the site, where the zone may be covered only by thin surficial deposits, such as alluvium) (17). No hydraulic connection is known to exist between Skull Creek and the Vamoosa-Ada

aquifer. Therefore, the deeper ground-water system that serves as a key water source in the area appears to be protected from surface water and shallow ground-water infiltration (1).

Water quality data for municipal wells and for the few private wells that have been sampled in the site vicinity do not show evidence of contamination from site releases.

Municipal Water

Cushing's principal water source is Cushing Municipal Lake on Big Creek Watershed, located about 6 miles southwest of the property. However, during dry weather that source is supplemented from 9 municipal wells located about 1½ to 3 miles to the south and southeast of the site..These wells extend into the Vamoosa-Ada aquifer, and casings are slotted to withdraw water from multiple permeable zones. Water is withdrawn from as shallow as 160 feet (19). Public water users in the site area are serviced either by the Cushing system or by the Rural Water and Sewer District No. 4. Discussion with a representative of District No. 4 indicates that they obtain water from a well in Cushing and purchase water from another system that has its source in Pawnee County.

ATSDR met with representatives of the water systems to clarify their service connections. All water users along Highway 18 and Granstaff Road in the site vicinity obtain their potable supplies from a public water system. Businesses and residents on Deep Rock Road, between Highway 18 and Linwood Avenue, also are connected to a public system. Along Linwood Avenue, the Deep Rock School and businesses use public water, and all but a few residents are connected.

Private Well Water

The history and current status of private well use in the site area are not clearly established. ATSDR staff toured the area with water system personnel and discussed their service connections. Those discussions and the results of well sampling activities indicate that 1) essentially all residences and businesses in the vicinity are connected to the public system, 2) a few of those connected also have a private well (which is most likely used for irrigation), and 3) a few have only a private well.

Water company representatives showed that all residences and businesses within at least ¾ mile of the site southward (in the direction of Granstaff Road) and westward (toward Highway 18) receive potable water from a public supply system. Northward, along an east-west trending unnamed road ½ mile from the site, one or two residences get their potable supply from private wells. Eastward, along Linwood Avenue, the Deep Rock School and all residences except two are connected to a public water system. One residence at the intersection of Linwood Avenue and Deep Rock Road gets potable water from a well, as does a residence on Property A. A business that may operate on Property A also is assumed to use well water. There once was a well at a former on-site home (one of the four removed about 1990 along Linwood Avenue, south of Deep Rock Road). That resident was contacted by ODEQ staff and reported she didn't recall ever using the well.

Farther away, between about ¾ mile and 3 miles from the site, ODEQ has found several other wells. ODEQ staff recently reported to ATSDR that their telephone calls to those well owners showed most are being used for potable purposes. A few of the property owners could not be contacted in that survey.

Surface Water

Skull Creek, which flows across the site in a northerly/northeasterly direction, has its headwaters in Cushing and discharges into the Cimarron River about 5 stream miles down gradient of the site. The city of Cushing once discharged treated effluent from their sewage treatment plant into the creek but terminated that practice in 1985. Site runoff and some discharge from on-site waste pits has also flowed into the creek (20). A few pools in the creek support fish year round, and fishing and swimming occur where the creek discharges to the Cimarron River (21). The creek is not used for irrigation (but is classified for use in agriculture) or as a public water supply. Livestock might use the creek for a water source. The Cimarron River has poor water quality and is not used as a public water supply source. Due to the high total dissolved solids the Cimarron River has been classified by the State Water Quality Standards Department as unsuitable for agricultural uses (22). Keystone Lake, into which the Cimarron River discharges about 32 miles downstream, is a public water source (1).

Biota

During a site visit, ATSDR learned that the site area supports many types of animals, including deer, rabbits, raccoons, and game birds. Hunting once had been permitted onsite.

### D. Health Outcome Data

ATSDR decided to evaluate cancer mortality (deaths) in the area because of citizens' concern about cancer. The Oklahoma Department of Health maintains the cancer registry (23). The registry was analyzed for the years 1976 to 1990. The results of the analysis are given in the Public Health Implication section (subsection C., Health Outcome Data Evaluation, on Page 20).

## COMMUNITY HEALTH CONCERNS

During our investigations, we received information about several citizens' concerns (24,25):

1. Are the numbers and types of cancers in the area attributable to the Kerr-McGee site?
2. Are the private and municipal drinking water supplies contaminated?
3. Are people being exposed to contaminants that might bioaccumulate in humans?
4. Is it safe to swim in or to water livestock from area ponds?
5. Are the numbers of illnesses and deaths in area neighborhoods attributable to the site?
6. Should citizens monitor their radiation doses with radiation badges?

Our response to these questions is provided in the Community Health Concerns Evaluation subsection (beginning on Page 20)

**Next Section** **Table of Contents**

# PUBLIC HEALTH ASSESSMENT

## KERR-MCGEE REFINERY SITE
## CUSHING, PAYNE COUNTY, OKLAHOMA

## ENVIRONMENTAL CONTAMINATION AND OTHER HAZARDS

### A. On-Site and Off-Site Contamination

ATSDR reviewed investigation data and made an initial selection of contaminants that may warrant further evaluation for public health significance. The extensive investigation programs, initial selection process, and tables of the contaminants chosen for further evaluation are presented in Appendix C (begins on Page 36)

The contaminants identified by that process and the exposure pathways in which they occur then were evaluated to determine whether any may be of public health significance. Those health significance evaluations identified several contaminants of possible public health concern (Key Contaminants) in certain environmental media both on site and off site. Those Key Contaminants are identified in the next paragraph.

### B. Key Contaminants

Key contaminants that were determined to warrant health clarification discussion in the Public Health Implications section (Page 14) include:

- Lead in Property A soils and sediment
  Note: not associated with Kerr-McGee site
- Lead, iron, sodium in some private wells
  Note: not associated with Kerr-McGee site
- Iron and sodium in public wells that supplement municipal water supply
  Note: not associated with Kerr-McGee site
- 2-Methylnaphthalene, naphthalene, benzo(a)anthracene, benzo(a)pyrene, chrysene, and phenanthrene in waste pit sludge on Kerr-McGee site
- Radiation on Kerr-McGee site

### C. Quality Assurance and Quality Control

ATSDR has relied on laboratory data provided in the referenced documents. Not all such data included quality control information. The completeness and reliability of laboratory information could affect the validity of ATSDR's conclusions.

### D. Physical and Other Hazards

ATSDR believes that the disposal pits, radiation management areas, building remnants, and debris do not pose physical or other personal hazards to knowledgeable workers. The potential hazard to intruders is mitigated by the substantial fences surrounding pits and radiation management areas, the fence system (at least 3 wire strands) and postings surrounding the entire property, and the general

remoteness of the property.

## PATHWAYS ANALYSES

ATSDR identifies human exposure pathways by examining environmental and human components that might lead to contact with contaminants. A pathway analysis considers five elements: a source of contamination, the presence or transport of contaminants in an environmental medium, a point where human exposure could occur, a route of human exposure, and an exposed population. Completed exposure pathways are those for which the five elements are evident, indicating that exposure to a contaminant has occurred in the past, is currently occurring, or will occur in the future. ATSDR regards people who come in contact with contamination as exposed: for example, people who drink contaminated water, or who reside in an area with contaminated air, or who work or play in contaminated soil are considered exposed Potential exposure pathways are those for which one or more of the elements is not clearly defined but through which exposure is plausible. Potential pathways indicate that exposure to a contaminant could have occurred in the past, could be occurring now, or could occur in the future.

### A. Completed and Potential Exposure Pathways Identified

ATSDR staff (through review of site history; past, current, and future activities; and media sampling data) have identified numerous completed past, current, or future exposure pathways on the site, off the site on Property A, and elsewhere off site. Those completed pathway components are summarized in Appendix D in three separate tables: 1) On-Site Pathways; Table D1 (see Page 115), 2) Off Site Pathways other than Property A; Table D2 (see Page 116), and 3) Property A Pathways; Table D3 (Page 117).

ATSDR also identified a few potential exposure pathways. Those pathways elements are summarized in Appendix D--Table D4 (Page 118).

### B. Key Exposure Pathways

Comprehensive evaluations of pathway components and issues have defined four key exposure pathways that warrant health-related discussions (presented in the Public Health Implications Section, which follows). Those key pathways are summarized below.

1. Soil ingestion (completed exposure pathway)
   1) Children and adults who reside on Property A in the past or in the future. (Note: exposure there is not associated with Kerr-McGee site), or,
   2) Children and adults who occasionally may enter the Kerr-McGee property are likely to be exposed to certain contaminants when they accidentally swallow small amounts of contaminated soil that clings to their hands, or
   3) Adults who worked on the Kerr-McGee site and who had activities that brought them into contact with soil, for example, while working at the sludge pits..

2. Drinking water (completed exposure pathway) -- Children and adults are likely to have been exposed to elevated levels of sodium when drinking water from certain private or public wells (Note: exposure not associated with Kerr-McGee site).

3. Sludge residue (potential exposure pathway) -- If for some reason sludge deposits on the Kerr-

McGee site are not fully and adequately remediated, after future development of the property for residential, commercial, business, or recreational use, children and adults could be exposed to certain contaminants when they accidentally swallow small amount of contaminated particles that cling to their hands.

4. Radiation (completed exposure pathway) -- Workers at Kerr-McGee have been exposed to radiation and some other adults and children who have entered the site have been exposed. If for some reason, affected areas are not fully and adequately remediated, after future development of the property for residential, commercial, business, or recreational use, children and adults could be exposed.

## PUBLIC HEALTH IMPLICATIONS

In this section we will discuss the possible health effects in people associated with key completed and potential exposure pathways, evaluate state and local health databases, and address specific community health concerns. Key exposure pathways are summarized in the preceding section.

### A. Toxicological Evaluation

Introduction

To evaluate health effects, ATSDR compares the estimated amount of exposure for a chemical or chemicals to health guidelines, such as ATSDR's Minimal Risk Level (MRL), which are derived from human and animal studies. The MRL is an estimate of daily human exposure to a contaminant below which non-cancer, adverse health effects are unlikely to occur. ATSDR also compares the estimated amount of exposure directly to human and animal studies, which are reported in ATSDR's chemical-specific toxicological profiles. Not only do the toxicological profiles provide health information, they also provide information about environmental transport, human exposure, and regulatory status. The toxicological profiles used in the preparation of this report were arsenic, barium, beryllium, cadmium, cobalt, copper, iron, magnesium, manganese, silver, and zinc. We also used toxicological profiles for naphthalene and polycyclic aromatic hydrocarbons. Certain inorganic metals (for example, copper, manganese, chromium, magnesium, iron, and zinc) are essential to human health but may be harmful if taken in excess. We have used guidelines established by the National Academy of Science as safe and adequate dietary intake levels for those metals. No MRLs have been established for any of the radionuclides present at the Kerr-McGee site. ATSDR does have toxicological profiles for uranium, radium, radon, and thorium.

Soil Ingestion Pathway

*Inorganic Metals*

Many inorganic metals were found in soil, sludge, and sediment from the site and from off the site at levels that warrant some explanation. They are arsenic, barium, beryllium, cadmium, cobalt, copper, iron, magnesium, manganese, silver, and zinc. Most of these inorganic metals were at levels typically found in soil from the western United States. Occasionally, some locations had levels that are greater than those typically found. Except for lead on Property A, none of the levels of inorganic metals in soil, sediment, and sludge, however, are likely to cause harmful effects in people regardless of whether the site or off-site areas are used for industrial, commercial, or residential purposes.

The one possible exception is lead on Property A in soil and in sediment from the stock pond. (Note: the lead and possible related exposure are not associated with the Kerr-McGee site.) If wide-spread soil contamination exists at higher levels detected in limited early sampling of Property A soil (2,564 parts per million--ppm) and sediment (1,839 ppm), then if pre-school children live or play on Property A or at the pond's edge frequently (either now or in the future), they could be exposed to levels of lead that might cause harmful effects. Significant exposure could occur if the property is developed residential. Such lead exposure could cause learning problems, lower IQ scores, and damage hemoglobin, a component of blood. It's uncertain if those effects are likely because so few soil and sediment samples have been taken to date. Therefore, it's not known if lead contamination is widespread.

Drinking Water Pathway

*Inorganic Metals*

Lead and Iron

Drinking water contaminants and related exposures are not associated with the Kerr-McGee site. Water taken from a private well in January 1990 contained 0.054 ppm lead and 14.5 ppm iron. Two samples taken in 1995 showed lead was as much as 0.045 ppm. Since this well was not used as drinking water, no one in the house was exposed to lead or iron. In 1995, analyses of two water samples for metals (but not iron) showed lead was 0.045 ppm and nondetect, respectively.

Several water samples taken in December 1989, and January 1990, from private wells contained iron at 0.06 - 1.2 ppm. In addition, one public well used to supplement reservoir well water also contained iron ranging from 1 to 16 ppm in 1989 and 5.9 ppm in 1995 (Table 12). Iron levels in private and public well water exceed EPA's secondary MCL for iron. EPA developed the secondary MCL for iron as a guide to when drinking water might be objectionable because of taste and aesthetic characteristics. Exceeding the secondary standard for iron means that the water may smell or taste bad. It may also stain clothes.

Several other inorganic metals (arsenic, cadmium, copper, magnesium, manganese, and zinc) were found in private and municipal wells. The levels detected, however, are not harmful.

Sodium

Elevated levels of sodium (greater than 20 ppm) were found in a private well being used for drinking water at the residence on Property A and also in public water supply wells used to supplement reservoir water obtained from the Big Creek watershed. (Note: sodium and related exposure are not associated with the Kerr-McGee site.) While sodium is generally non-toxic, people who are on a salt-restricted diet because of medication or because of previously diagnosed cardiovascular disease should avoid drinking water that contains sodium at levels greater than 20 ppm (25, 26). Sodium intake in such instances could lead to adverse drug reactions or could contribute to cardiovascular disease.

It's uncertain whether or not people using municipal water have been at risk from sodium exposure because the well water probably mixed with some reservoir water before distribution, which should have reduced the sodium levels.

Sludge Ingestion Pathway

*2-Methylnaphthalene and Naphthalene*

2-Methylnaphthalene and naphthalene, natural components of crude oil, are present in sludge on the Kerr-McGee site at a maximum level of 5,000 and 620 ppm, respectively. ATSDR has been informed that the sludge pits are being cleaned up. If for some reason the sludge pits would not be fully and adequately remediated and if pit locations later are developed for residential use, some children at play are likely to be exposed to 2-methylnapthalene and naphthalene. That exposure would occur as children, especially pre-school children, accidentally swallow particles that cling to their hands while playing. Exposure would be greater for a small percentage of pre-school children who are known to purposely swallow soil. We designate such activity as soil-pica behavior, the activity of eating non-food items. Such behavior is highest in 1 and 2 year-old children and diminishes as they approach elementary-school age. Children might also be exposed via inhalation as 2-methylnapthalene and naphthalene evaporate into the air. However, it's not possible to estimate the level of exposure.

No information in human studies and very limited information from animal studies are available about the toxic effects of 2-methylnaphthalene. One mouse study that injected 2-methylnapthalene into the peritoneum (a membranous sac that surrounds the body's internal organs) showed damage to certain cells in the lungs. One could postulate that children playing on or near sludge might breathe in 2-methylnapthalene vapors. That inhalation exposure, if high enough, might damage those cells. However, there is much uncertainty in that statement since we do not know the concentration of 2-methylnaphthalene in air above or beyond the sludge, and since we are uncertain about it's ability to damage Clara cells once inhaled.

Since naphthalene is structurally similar to 2-methylnapthalene (differs only by a methyl group), naphthalene toxicity might be used as a guide to the toxicity of 2-methylnapthalene. Combining the concentrations of 2-methylnaphthalene and naphthalene and using naphthalene's toxicity as a guide, pre-school children who accidentally swallow contaminated materials are not likely to experience any harmful effects. The same is true for adults. However, pre-school children who have soil-pica behavior might experience effects to the blood, liver, and neurological system. Some children of Asian, Mediterranean, or African origin are more sensitive to 2-methylnaphthalene and naphthalene. This is because children with those origins are likely to have lower levels of glucose-6-phosphatase, an enzyme responsible for altering naphthalene to a less toxic form (26, 27).

*Benzo(a)anthracene, Benzo(a)pyrene, Chrysene, and Phenanthrene*

Benzo(a)anthracene, benzo(a)pyrene, chrysene, and phenanthrene, which are present in sludge on the Kerr-McGee site, are known as polycyclic aromatic hydrocarbons or PAHs. Studies have shown that benzo(a)anthracene, benzo(a)pyrene, and chrysene are carcinogenic in animals, which suggests that they may cause cancer in humans. No evidence has shown that phenanthrene can cause cancer in humans or animals.

If for some reason the sludge pits would not be fully and adequately remediated, industrial, commercial, or residential development involving the sludge pit locations could lead to human exposure to PAHs. Such exposure, especially should the locations become residential, might increase the possibility of people getting cancer should they come in contact with the sludge contaminants. Skin contact with the PAHs in the sludge may also cause irritation, burning, inflammatory spots,

eruption of blood vessels, and sensitization to sunlight.

**B. Radiological Evaluation**

As mentioned in the preceding section, ATSDR has not established MRLs for any of the radionuclides present at the Kerr-McGee site or for ionizing radiation. ATSDR does have toxicological profiles for uranium, radium, radon, and thorium. A general discussion about radioactivity and health is provided in Appendix E.

Overview: Gamma Radiation Exposure and Health

Gamma radiation, a very penetrating type of ionizing radiation similar to x-rays, is emitted from certain radioactive elements in the ground (and sometimes other media) and travels through the air to the human body. Emissions are continuous, and body exposure can occur at some distance from the actual contamination source. The general health effects of ionizing radiation can be divided into those that are related to dose and those that are not dose related. The effects that are not dose related possibly have a threshold (minimum dose) that must be exceeded before the effects are observed. These effects are non-stochastic or deterministic effects. The risk of developing cancer from exposure to ionizing radiation, however, may be dose related with perhaps no threshold - a stochastic or random effect.

Ionizing radiation can damage body cells in multiple ways. The radiation can damage strands of genetic material, DNA, in a cell. The cell may not be able to repair this type of damage and will die, or the cell may live on but function abnormally. If an abnormally functioning cell divides and reproduces, a mutation may develop in the tissue. The rapidly dividing cells that line the intestines and the stomach and blood cells in the bone marrow are very sensitive to ionizing radiation damage. Organ damage results from the cumulative effects on individual cells. Organ damage has been reported with doses of 25 to 500 rads (note: an annual level that is 100 to 500 times higher than estimated at the site). Acute radiation effects are seen only after doses of greater than 50 rads. When human reproductive system cells are damaged by radiation, genetic damage may occur in the offspring. The type of malformation is related to the stage of fetal development and the cells that are differentiating at the time of exposure.

Site-Specific Gamma Radiation and Effects

Radiological contamination at the site is localized within specific areas. Site area surveys using sensitive measuring instruments show ionizing radiation occurs at some of these areas at levels slightly elevated above background levels, and at some locations, including some sludge in Pit 4 (located in the northeast part of the property), at somewhat greater levels. For purposes of this discussion, ATSDR calls the areas of greater radiation "hot spots". The majority of the "hot spot" areas are located north of Deep Rock Road, which is shown on Figure 1. These areas have been posted and in many cases fenced to reduce potential exposures from inadvertent intrusion.

ATSDR concludes that ionizing radiation is a completed exposure pathway. Many of the workers and some of the other nonworker adults and children that have been on the site have been exposed without having been directly in contact with radioactive materials. In evaluations, ATSDR conservatively assumed the "hot spot" contamination to be uniformly distributed over an "area-wide" ground surface and that human receptors spend extensive time at that location. These assumptions conservatively overestimate the radiation exposure and potential for health effects. In actuality, the chances of such

exposure magnitudes having occurred are remote.

For purposes of this discussion, ATSDR considers the exposure rate in roentgens to be equivalent to rem (a unit of radiation dose). Current regulatory public exposure limits to ionizing radiation are 100 millirem per year (10 CFR 20.1301). This also applies to workers who are not classified as occupational radiation workers (see 10 CFR 20.1003). Using the assumption that the contamination is uniformly distributed in the "hot spot" areas and the exposure rate (except at Pit 4) is 50 microroentgens per hour ($\mu$R/h) or about 0.05 millirem per hour, this statutory limit would be reached after spending 8 hours per day for one year (250 days) in a "hot spot" area. No adverse health effects would be expected at this dose.

Many of the hot spots, including portions of sludge at Pit 4, contain elevated levels of both ionizing radiation and radioactive material. Within the Nuclear Process Areas, the maximum ionizing (gamma) radiation levels detected exceeded 120 microroentgens per hour ($\mu$R/h). Similarly, in Pit 4 reported values were also 120 $\mu$R/h. Although the level of ionizing radiation at these locations would result in an annual dose in excess of the current 100 millirem per year limit using the above occupancy scenario, no adverse health effects would be expected as a result of the remediation activities.

Among the radionuclides, thorium-232, radium-226, and uranium-234/235/238 well exceed background levels in soils. The maximum concentrations found were 206 picocuries per gram (pCi/g) for thorium-232, 494 pCi/g for radium-226, 940 pCi/g for uranium-234, 36 pCi/g for uranium-235, and 116 pCi/g for uranium-238. These levels were not necessarily restricted to the Nuclear Process Area but typically were in areas that had been fenced to preclude inadvertent intrusion. Background concentrations for these radionuclides, excluding uranium-235, are less than 4 pCi/g. For uranium-235, the site-associated background is on the order of 0.15 pCi/g. The maximum concentrations of radionuclides in the Pit 4 sludge range from 8.3 to 34 pCi/g. Radium-228 was elevated; whereas, the radium-226 is not considered elevated in the pit. Incidental ingestion exposure by workers or others to these concentrations would not be expected to result in adverse health effects during remediation.

If for some reason sludge in Pit 4 (or any other sludge that might be similarly impacted) and other hot spots would not be fully and adequately remediated, the levels of ionizing radiation do pose a serious, long-term health effect as exposures can approach or exceed 1 rem per year for persons associated with future industrial, commercial, or residential development. Furthermore, when coupled with the possible incidental ingestion of radionuclide-contaminated sludge, these risks are increased as the radiation dose from the ionizing radiation component must be added to the radiation dose from the ingestion pathway. At this potential level of exposure the chance of leukemia, other cancers, or organ damage is greatly increased. Considering the degree of oversight by both ODEQ and NRC regarding ongoing remediation activities the chance for a future significant exposure is remote.

Uranium

The primary human studies about exposure to uranium have been on uranium miners and uranium mill workers. Those workers were exposed to high levels of uranium dust and fumes and other radioactive elements in confined conditions (28). The studies have shown there has been a statistically significant increase in lung cancer deaths among these workers. That greater incidence effect may have been attributable to the decay of uranium into radon and its further decay products or other non-radioactive constituents those workers might have inhaled.

Toxicological effects from the ingestion of uranium are the result of the action of uranium as a metal

and not its radioactive properties. The primary toxic chemical effect is seen in kidney damage. Studies in rabbits, mice, and dogs showed kidney damage in a dose-related effect. The dose of uranium given in these tests is thousands of times higher than would be expected at the site. In humans, the absorption of ingested uranium is very low; an estimated 5 per cent crosses the gastrointestinal tract. The current theory is that a concentration in the kidneys equal to 3 micrograms of uranium per gram of kidney weight is necessary before kidney damage is seen. The concentrations of uranium in the contaminated areas of the Kerr-McGee site are elevated; however, at the concentrations present, health effects arising from uranium exposure are considered unlikely.

**C. Health Outcome Data Evaluation**

We have evaluated cancer mortality (deaths) in the area because of citizens' concerns about cancer. The Oklahoma Department of Health provided data on cancer deaths by age, sex, and type of cancer in Cushing, Payne County, and the State of Oklahoma for 1976 to 1990.

We omitted the town of Stillwater from the Payne County population because it is a college community. Having such a young population may reduce the cancer rate for Payne County. Cushing and the remainder of Payne County were selected as the study populations and Oklahoma as a reference population. Due to low number of cancer deaths in the population, we had to combine data for all 15 years to generate a cancer mortality rate. The results are presented in Appendix F, Table F1 (page 122).

No significant differences appeared between any female cancer type for Cushing when compared to Oklahoma or to Payne County.

Men in Cushing may have more deaths from prostate cancer than the State of Oklahoma. The cause of this increase is unknown. Significantly fewer male deaths occurred from lung cancer in Payne County than in Oklahoma or Cushing. Payne County may have fewer total male cancer mortalities for its population than the State of Oklahoma. It's difficult to be certain of the results of the analysis, however, because the number of cancers and the number of people in the population are small.

This evaluation of cancer rates cannot be used to determine if the Kerr-McGee site has caused cancer in people who worked there or who lived near the site. It can be used to give the reader an idea if certain types of cancer or if cancer in general are significantly elevated in Cushing or Payne County. Knowing the cancer rates can be used to decide whether or not educational efforts are warranted by educating people about life-style factors that might contribute to cancer.

**D. Community Health Concerns Evaluation**

During an early phase of our investigations, community members raised several concerns, which are addressed below:

1. Are the numbers and types of cancers in the area attributable to the Kerr-McGee site?

    *It seems unlikely that cancers in Cushing or Payne County are being caused by chemical or radiological contamination at the Kerr-McGee site. To increase the risk of someone getting cancer from environmental exposure, they would have to be exposed to significant levels of a cancer-causing chemical or radiation frequently for long periods (years). The most significant contamination by a chemical on the site that can cause cancer is from*

*PAHs in the sludge pits. The public is not likely to be exposed to these site chemicals frequently over many years because residents would have to come in direct contact with sludge for PAH exposure to occur.*

*While some inorganic metals were found in soil on the site and in Property A that have been shown to cause cancer at very high exposure levels, the levels in soil at the site are at or near background levels for those metals. It's unlikely that the inorganic metals will cause cancer in people under those circumstances.*

*The analysis of cancer statistics for Cushing and Payne County showed that women in those areas have the same cancer rates as the state as a whole. For men, the only cancer that was found to be elevated was prostrate cancer. It's not possible to determine if contaminants at the Kerr-McGee site are responsible for the elevated rate of prostrate cancer in men.*

2. Are the private and municipal drinking water supplies contaminated?

*Private wells and certain municipal water wells in Cushing that are used to supplement reservoir water have some inorganic metals. The levels of those inorganic metals are not harmful. The source of those inorganic metals does not appear to be from the Kerr-McGee site but rather they are naturally occurring in the groundwater.*

*A private well on Property A and several supplemental municipal water supply wells in Cushing contained elevated levels of sodium. The source of sodium appears to be natural and not attributable to the Kerr-McGee site. While sodium is usually not harmful, people who are on a salt-restricted diet because of medication or because of previously diagnosed cardiovascular disease should avoid drinking water that contains sodium at levels greater than 20 ppm (25, 26). Sodium intake in such instances could lead to adverse drug reactions or could contribute to cardiovascular disease.*

*It's uncertain whether or not people using municipal water are at risk from sodium exposure because the public water supply was probably mixed with water from the reservoir, which may have reduced the sodium levels.*

*Gross alpha and gross beta radiation levels known in some private wells and radiation in public wells are below levels of public health concern and below Maximum Contaminant Levels (MCL) water quality criteria. Without more extensive radionuclide sampling, we cannot fully evaluate the radionuclide contamination presence or origin in private and municipal wells.*

3. Are people being exposed to contaminants that might bioaccumulate in humans?

*None of the chemicals present on the Kerr-McGee site or in Property A soils will bioaccumulate in humans through a food-chain pathway. If lead contamination is widespread on Property A at high levels, lead could accumulate in children who might live or play on that property.*

4. Is it safe to swim in or water livestock from area ponds?

*The stock pond on Property A is in the same watershed as the Kerr-McGee site and has been shown, through limited sampling, to contain substantive contamination. Thus, swimming in that pond is inappropriate unless measures are taken to clean up the pond. ATSDR is unable to comment on suitability of the pond for watering stock.*

*None of the several other ponds examined in the site vicinity are in the site watershed. The nearest two ponds are on adjacent property north of the Kerr-McGee site and are located spatially and topographically such that substantive contamination from the site is not likely to have occurred. Water samples obtained from that pond do not show elevated levels of the radioactive, water quality, and metals analyzed; however, organic compounds were not analyzed, and sediments were not sampled. Hence the analyses are not sufficient to confirm whether the two ponds are suitable for swimming. Sampling conducted at other ponds in the site vicinity also was limited, but those ponds are at locations that are not likely to have been affected by the site.*

5. Are the numbers of illnesses and deaths in area neighborhoods attributable to the Kerr-McGee site?

   *It seems unlikely that chemical or radiological contamination at the Kerr-McGee site caused illnesses and deaths in neighborhoods near the site.*

6. Should citizens monitor their radiation doses with radiation badges?

   *Radiation levels present on the Kerr-McGee site, at their fenceline, and in off-site areas would not indicate that any type of personnel monitoring would be necessary.*

**Next Section** **Table of Contents**

# PUBLIC HEALTH ASSESSMENT

## KERR-MCGEE REFINERY SITE
## CUSHING, PAYNE COUNTY, OKLAHOMA

## CONCLUSIONS

1. The Kerr-McGee site does not currently present a health hazard to the public. However if Kerr-McGee does not complete planned remedial activities, and the property is later developed for residential use, residents could be exposed in the future to contaminants and radioactive materials that might harm their health.

   Property A, which is not associated with the Kerr-McGee site, is an indeterminate public health hazard because sufficient chemical and radiological data are not available to adequately evaluate environmental media. Lead contaminated soil and sediment were found on the property; the extent of such contamination, which is not known at this time, would determine whether or not those media are a public health threat.

2. Water from some area private wells and some public wells have been found to contain somewhat elevated levels of iron and sodium, which are not associated with the Kerr McGee site.

3. While investigating the Kerr-McGee site, several questions and concerns were raised by the community. Our responses are provided in the Community Health Concerns Evaluation subsection (starting on Page 20).

4. Data limitations for the site vicinity, except for Property A:
   a. Private wells off site: A current private well survey and sampling are needed to better identify potable private well users and associated water quality in the site vicinity.
   b. Ponds off site: Additional water and sediment samples are needed for the two ponds immediately north of the site to confirm whether they can be safely used for swimming.
   c. Samples need to be analyzed for a comprehensive set of inorganic, organic, and radiologic parameters.
   d. Area radiation data: The radiation 10-meter-grid survey conducted onsite showed elevated levels of radiation along a portion of the north property line. Additional radiation data are needed beyond that part of the property line to confirm levels on the immediately adjoining private property.
   e. Public wells-- Information is needed about sodium levels in water being distributed by the Cushing public water system to determine whether elevated sodium found in the well water used to supplement reservoir water is sufficiently diluted before delivery to end users.

5. Data limitations for Property A, which is not associated with the Kerr-McGee site:
   a. Investigations needed: More extensive soils, sludge, surface water, sediment, and groundwater analyses need to be part of the expected site investigations. A gamma survey is needed at sludge deposits and then expanded if initial findings warrant.
   b. Private well: Annual sampling of the on-site well is needed.

c. Samples need to be analyzed for a comprehensive set of inorganic, organic, and radiologic parameters.

## RECOMMENDATIONS

### A. Reduce Exposure Recommendations

1. Areas of the Kerr-McGee site that have substantive concentrations of chemical and radioactive-contaminated material need to be remediated satisfactorily, as planned, prior to reuse for industrial, commercial, residential purposes. The oversight by both ODEQ and NRC reduce any potential that the site will not be remediated. At Property A, people in the residence should be advised of elevated lead found in surface soil and in pond sediments.

2. Area private well users whose potable water is shown to contain elevated iron (or other contaminants)--see Characterization Recommendations below-- should be advised about the possible consequences associated with water consumption. This is not considered a problem caused by the Kerr-McGee site. On Property A, the well owners should be advised of elevated sodium in the water.

3. Optimal dust control measures should be implemented during remedial activities. ATSDR understands that control measures are an integral part of the site remediation plans.

### B. Characterization Recommendations

1. Conduct a survey of private wells in the area, identify those used for potable supplies, and analyze water quality. The survey should extend ¾ miles beyond the combined Kerr-McGee and Property A boundaries. The two known nearest private wells--on Property A and on property at the northeast corner of Linwood Avenue and Deep Rock Road--should be analyzed annually until there is firm evidence that contaminants will not affect those wells. Samples should be analyzed for inorganic, organic, and radioactive contaminants. Any health implications associated with such sampling should be conveyed to the well owners, and alternate supply obtained as appropriate.

2. Additional sampling is recommended for the two ponds north of the Kerr-McGee property. Both water and sediment should be analyzed for inorganic, organic, and radioactive contaminants. Any health implications associated with swimming use of the ponds should be conveyed to the owners.

3. The 10-meter grid radioactivity survey conducted on the Kerr-McGee site should be extended northward onto immediate adjacent property and, if findings warrant, remediation should be undertaken.

4. Although sodium in area groundwater is not associated with the Kerr-McGee site, an evaluation should be initiated to determine whether the sodium level being delivered at the tap by the Cushing water distribution system at certain times is at a level that might adversely affect the health of some users. The study should be conducted at a time when maximum sodium levels might be conveyed to the tap--it seems that may occur during extended drought periods when substantive groundwater is being pumped to supplement the reservoir supply.

5. The comprehensive investigation of Property A being planned should include more extensive soils, sludge, surface water, sediment, and groundwater sample analyses. A gamma survey should be conducted at sludge deposits and then expanded if initial findings warrant. Samples need to be analyzed for a comprehensive set of inorganic, organic, and radiologic parameters.

## HEALTH FOLLOW-UP RECOMMENDATIONS

Data and information developed in early phases of the Public Health Assessment process for the Kerr-McGee Cushing Site were evaluated by ATSDR's Health Activities Recommendation Panel (HARP), and several health-related recommendations were proposed for follow-up. Information developed in later phases of the assessment process appropriately addressed the issues in which HARP had expressed an interest. Thus, there are no HARP recommendations at this time.

## PUBLIC HEALTH ACTION PLAN

The Public Health Action Plan for the Kerr-McGee Cushing site describes actions taken and pending to mitigate and prevent adverse human health effects resulting from exposure to hazardous substances in the environment.

### Actions Taken

Substantive public health actions already taken by Kerr-McGee include:

1. Repaired fencing around pits and installed higher fencing. Entire perimeter of site is now fenced. Ceased granting permission for recreational activities on site.

2. Extensive remedial activities to reduce or eliminate contaminant and radiation sources and migration pathways. Dust control has been implemented in all remedial activities, and monitoring equipment is documenting that dust control measures are effective.

3. Acquired essentially all privately held land within the original Kerr-McGee site boundary in order to control development and use. Removed residences on property.

4. Structured plans in place for future reuse of property.

### Actions Pending

1. Further remedial activities will be conducted on the Kerr-McGee property to reduce or eliminate contaminant and radiation sources and migration pathways.

2. Investigations are to be conducted on Property A.

## PREPARERS OF REPORT

### Authors

David Mellard, Ph.D.; Paul Charp, Ph.D.; and Don Gibeaut
Division of Health Assessment and Consultation

Agency for Toxic Substances and Disease Registry

With participation by

Amy Delf King and Robin Ruark Brothers, Ph.D.
Risk Analysis Section
Health and Safety Research Division
Oak Ridge National Laboratory

Assisted by:

Elaine Zeighami, Ph.D. and Joni Skiles, M.S.
Statistics and Health Outcome Data Evaluation
Health and Safety Research Division
Oak Ridge National Laboratory

Linda Bond
Technical Editing and Format
Health and Safety Research Division
Oak Ridge National Laboratory

**ATSDR Regional Representative**

George Pettigrew, Dallas

## REFERENCES


1. Burns and McDonnell: Interim Remedial Investigation/ Feasibility Study, Cushing Kerr-McGee Refinery Site, Cushing, Oklahoma. August 1990. [ATSDR code A1]

2. Morton Associates. Cushing Refinery Site, Site Decommissioning Plan. April 25, 1994. [ATSDR code A57]

3. Peterson, J. C. Site Assessment Report for Rafferty Property site assessment/ sampling, Cushing, Payne County, Oklahoma. Ecology and Environment, Inc.; May 19, 1988. [ATSDR code A28]

4. Hoffman, B. Letter to Douglas Fasset [ATSDR code Environmental Protection Agency (EPA)] including three attachments of information regarding the Cushing Kerr-McGee Refinery. June 21, 1988. [ATSDR code A4]

5. Burns and McDonnell: Phase I Remedial Investigation Report (Draft), Kerr-McGee Cushing Refinery, Cushing, Oklahoma. May 1992. [ATSDR code A2]

6. Kerr-McGee Corporation. Descriptions of Small Waste Pit Locations, Cushing Small Waste Pit Delineation Investigation. July 1994. [ATSDR code A65]

7. McHard, D. Briefing paper for use by the Governor of Oklahoma in preparing for press conference on October 10, 1989. Oklahoma State Department of Health. October 1989. [ATSDR code A5]

8. Personal communications with the Radionuclide Safety Division of the Oklahoma State Department of Health regarding recent remedial actions on the Kerr-McGee site. October 26, 1992. [ATSDR code A9]

9. Burns and McDonnell: Phase I Remedial Investigation Report (Final), Kerr-McGee Cushing Refinery, Cushing, Oklahoma. April 1993. [ATSDR code A53]

10. Kerr-McGee. Cushing Site Radiological Survey: Harris, Martin, and Vincent Properties. November 2, 1989. [ATSDR code A7]

11. Kerr-McGee Corporation. Radiological Characterization Survey, Cushing Refinery Site. Kerr-McGee Corporation. May 4, 1991. [ATSDR code A27]

12. Kerr-McGee Corporation. Final Radiation Survey of Four Unaffected Areas of the Cushing Refinery Site. April, 1995. [ATSDR code A60]

13. Fluor, Daniels, Williams Brothers. Phase I Remedial Design. March 1995. [ATSDR code A59]

14. Personal communication with Oklahoma State Employment Security Commission -Research Division. August 26, 1991. [ATSDR code A12]

15. Personal communication with superintendent of Cushing schools. August 27, 1991. [ATSDR code A13]

16. Dricoll, F. Groundwater and Wells. 2nd edition. St. Paul, Minnesota: Johnson Filtration Systems, Inc.; 1989. [ATSDR code A15]

17. Bates, R. and J. Jackson. Glossary of Geology. 2nd edition. Falls Church, VA: American Geology Institute; 1980. [ATSDR code A16]

18. Freeze, R and J. Cherry. Groundwater. Englewood Cliffs, NJ: Prentice Hall; 1979. [ATSDR code A17]

19. Record of Communication between FIT biologist and Cushing city engineer. August 14, 1989. [ATSDR code A18]

20. Kauffman, R. Kerr-McGee site visit notes. 1990. [ATSDR code A10]

21. Personal communication with Cushing city engineer. September 12, 1991. [ATSDR code A11]

22. Personal communications with Standards and Research Division of Oklahoma State Department of Health regarding water use classification for Skull Creek. January 17, 1992. [ATSDR code A21]

23. Personal communication with the Oklahoma State Department of Health - Data Management Division. August 26, 1991. [ATSDR code A22]

24. Citizen. Record of communication to Region VI National Priorities List (NPL) Coordinator.

December 8, 1989. [ATSDR code A23]

25. Citizen's Kerr-McGee Oversight Committee. Letter to C. Hickam, ATSDR Regional Representative, Region VI. May 10, 1990. [ATSDR code A24]

26. Seiler, H.G., H. Sigel, and A. Sigel, eds. Handbook on Toxicity of Inorganic Compounds. New York: Marcel Dekker, Inc., 1988. [ATSDR code A38]

27. Agency for Toxic Substances and Disease Registry. Toxicological Profile for Naphthalene and 2-Methylnaphthalene, Draft. Atlanta: ATSDR, October 1989. [ATSDR code A45]

28. ATSDR Draft Toxicological profile for Uranium, U.S. Department of Health and Human Services, ATSDR, Atlanta, GA, 1989. [ATSDR code A49]

29. National Library of Medicine. Toxicology Data Network (TOXNET). Toxic Chemical Release Inventory. Bethesda, MD. Telephone: (301) 496-6193. [ATSDR code A26]

30. Kerr-McGee Corporation. Internal Correspondence describing thermal luminecent dosimeter and air sample gamma data from activities conducted during 1994. September 6, 1995. [ATSDR code A64]

31. National Primary Drinking Water Regulations; Radionuclides. Federal Register. July 18, 1991; 56:33050-33129. [ATSDR code A71]

32. Oklahoma Department of Environmental Quality. Memorandum and Data Sheets. Soil and Radioactivity Data for Deep Rock School. July 14, 1995. [ATSDR code A61]

33. Thompson, S. Final Report of Private Well and Pond Sampling near the Kerr-McGee Cushing Refinery Site. Oklahoma State Department of Health. July 16, 1990. [ATSDR code A20]

34. Kerr-McGee Corporation. Comments of the Kerr-McGee Corporation in Response to EPA's Proposed Listing of the Cushing, Oklahoma Site. Washington, D.C.: Covington and Burling, 1989. [ATSDR code A29]

35. Oklahoma Department of Environmental Quality. Transmittal and Data Sheets. Public Water Supply Wells, Selected Samples Taken in 1994 and 1995. August 29, 1995. [ATSDR code A62]

36. Oklahoma Department of Environmental Quality. Letter and data sheets providing water quality data for a private well. August 16, 1995. [ATSDR code A63]

37. Southwest Laboratory of Oklahoma. Laboratory data set. January 5, 1996 [ATSDR code A66]

38. Core Laboratories. Laboratory data set. January 18, 1996 (ATSDR code A67]

39. Oklahoma Department of Environmental Quality. Letter and laboratory data set. February 8, 1996. [ATSDR code A68]

40. Kerr-McGee. Internal correspondence concerning radioactivity measurements. January 29,

1996. [ATSDR code A69]

**Next Section** **Table of Contents**