IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-5 T

(Judge Margaret M. Sweeney)

KERR-MCGEE CORPORATION AND SUBSIDIARIES

Plaintiffs,

v.

UNITED STATES,

Defendant.

PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

COOLEY GODWARD KRONISH LLP

1114 Avenue of the Americas
New York, New York 10036
(212) 479-6000
(212) 479-6275

TABLE OF CONTENTS

Page

INTRODUCTION ..... 1
A. Plaintiffs' Initial Memorandum. ..... 1
B. Defendant's Response. ..... 2
FACTS ..... 2
ARGUMENT ..... 4
A. The *per se* result for liabilities assumed as part of the cost of an acquisition has no application to the undisputed facts of this case. ..... 4
B. There is no absolute rule that a taxpayer cannot deduct the cost of correcting pre-acquisition conditions. ..... 6
1. The Government's reliance on *United Dairy Farmers, Inc. v. United States* is misplaced. ..... 6
2. The remediation expenditures at issue in this case satisfy the requirement that they be "appropriate and helpful" to Kerr-McGee's business. ..... 11
C. The Government fails to meaningfully distinguish Kerr-McGee's authorities. ..... 12
D. Kerr-McGee's position best matches its costs with the revenues to which they are related. ..... 14
CONCLUSION ..... 15

TABLE OF AUTHORITIES

Page

**CASES**

*Allen v. Commissioner*, 15 T.C.M. (CCH) 464 (1956) .... 8

*Bloomfield Steamship Company v. Commissioner*, 33 T.C. 75 (1959), *aff'd per curiam*, 285 F.2d 431 (5th Cir. 1961) .... 4

*Buckland v. United States*, 66 F. Supp. 681 (D. Conn. 1946) .... 8

*California Casket Co. v. Commissioner*, 19 T.C. 32 (1952) .... 9

*Cinergy Corp. v. United States*, 55 Fed. Cl. 489 (2003) .... 4, 13, 14

*Commissioner v. Tellier*, 383 U.S. 687 (1966) .... 11

*David R. Webb Company, Inc. v. Commissioner*, 708 F.2d 1254 (7th Cir. 1983) .... 4

*Dominion Resources, Inc. v. United States*, 219 F.3d 359 (4th Cir. 2000) .... 7, 8

*Estate of Walling v. Commissioner*, 373 F.2d 190 (3d Cir. 1967) .... 10

*H.S. Crocker Co. v. Commissioner*, 15 B.T.A. 175 (1929) .... 8

*Hubble v. Estate of Kavanagh*, 54-1 U.S.T.C. ¶ 9364 (E.D. Mich. 1954) .... 8

*INDOPCO, Inc. v. Commissioner*, 503 U.S. 79 (1992) .... 11

*Jackson v. Commissioner*, 67 T.C.M. (CCH) 2392 (1994) .... 8

*Jones v. Commissioner*, 242 F.2d 616 (5th Cir. 1957) .... 7, 8, 15

*Jones v. United States*, 279 F. Supp. 772 (D. Del. 1968) .... 7, 8, 15

*L. Heller & Son, Inc. v. Commissioner*, 12 T.C. 1109 (1949), *acq.*, 1949-2 C.B. 2 .... 12

*La France Wine Co. v. Commissioner*, 33 T.C.M. 1130 (CCH) (1974) .... 9

*Lohrke v. Commissioner*, 48 T.C. 679 (1967) .... 11

*Lutz v. Commissioner*, 282 F.2d 614 (5th Cir. 1960) .... 11

*Mills v. Commissioner*, 4 T.C.M. (CCH) 863 (1945) .... 8

*Osage Steamship Co., Ltd. v. Commissioner*, 3 B.T.A. 141 (1925) .... 8

*Pacific Transport Company v. Commissioner*, 483 F.2d 209 (9th Cir. 1973) .... 4

TABLE OF AUTHORITIES
(CONTINUED)

Page

*Plainfield-Union Water Co. v. Commissioner*, 39 T.C. 333 (1962) .............................................. 8

*Saccone v. Commissioner*, 39 T.C.M. (CCH) 616 (1979) ........................................................... 8

*Scruggs-Vandervoort-Barney, Inc. v. Commissioner*, 7 T.C. 779 (1946), *acq.*, 1946-2 C.B. 5... 12

*Seahill Co. v. Commissioner*, 23 T.C.M. (CCH) 408 (1964)......................................................... 8

*United Dairy Farmers, Inc. v. United States*, 267 F.3d 510 (6th Cir. 2001) ......................... *passim*

*Welch v. Helvering*, 290 U.S. 111 (1933) ........................................................................... 11

**STATUTES**

26 U.S.C. § 162(a) ........................................................................................................... 10

26 U.S.C. § 198............................................................................................................... 15

26 U.S.C. § 263.......................................................................................................... 5, 7, 10

42 U.S.C. § 9601(35)(A)...................................................................................................... 3

42 U.S.C. § 9607(a)(2).................................................................................................... 2, 3

42 U.S.C. § 9607(b)(3) .................................................................................................... 2, 3

**OTHER AUTHORITIES**

Robert L. Bronston, *The Case Against Intermediate Owner Liability Under CERCLA for Passive Migration of Hazardous Waste*, 93 Mich. L. Rev. 609, 610 (December 1994) ...... 3, 10

**REGULATIONS**

Treas. Reg. § 1.263(a)-1(b)..................................................................................................... 5

**MISCELLANEOUS**

Rev. Rul. 73-226, 1973-1 C.B. 62 ....................................................................................... 12

Rev. Rul. 94-38, 1994-1 C.B. 35 ......................................................................... 1, 8, 11, 12

# INTRODUCTION

*A. Plaintiffs' Initial Memorandum.*

In their Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment (the "Memorandum"), plaintiffs ("Kerr-McGee") demonstrated that the remediation expenditures at issue in this case were the economic equivalent of pouring money down the drain; Kerr-McGee captured no value from making the expenditures other than relief from its obligations under CERCLA. If Kerr-McGee's tax result in this case is to conform to its economic results, the expenditures must be deductible.

Kerr-McGee demonstrated that the letter and purpose of the relevant authorities support the deductibility of its expenditures. The law is settled that the costs of environmental remediation of contamination put in the ground by the taxpayer are deductible. The Government concurred in Rev. Rul. 94-38, 1994-1 C.B. 35. Therefore, if Kerr-McGee had put the contamination in the ground, there is no dispute that the costs of remediation would have been deductible.[1]

The question is whether that result should change because Kerr-McGee cleaned up contamination that was present when it acquired the property in 1956. Kerr-McGee demonstrated that it should not and that the case law supports its position.

Kerr-McGee concluded by observing that the goal of matching expenditures with the revenues to which they are related, a goal identified by the Supreme Court as the fundamental purpose of the distinction between capital and deductible expenditures, is best achieved by allowing a deduction in this case.

---

[1] In fact, the Internal Revenue Service allowed Kerr-McGee to deduct the portion of the remediation costs attributable to the contamination it put in the ground at the site.

*B. Defendant's Response.*

In its memorandum opposing plaintiffs' motion for partial summary judgment (the "Response"), the Government, while agreeing that a taxpayer can deduct the cost of cleaning up its own contamination, contends that a taxpayer cannot deduct the cost of cleaning up contamination that was present when the taxpayer bought the property. The Government articulates two theories, but they differ only semantically. First, it argues that correcting a pre-acquisition condition is never a deductible cost of the taxpayer's own business. Second, it argues that correcting a problem created by a prior owner cannot be helpful to the taxpayer's own business.

The Government defends its theories as supported by an unbroken line of cases and its revenue ruling. Oddly, the Government also characterizes this case as one of first impression because Kerr-McGee re-acquired the property solely for the purpose of remediating it.

## FACTS

In its statement of the facts, the Government asserts that Kerr-McGee was not liable under CERCLA for the cleanup of the prior owners' contamination because it could have relied on 42 U.S.C. § 9607(b)(3), which is commonly referred to as the "third-party defense."[2] The implication is that Kerr-McGee volunteered to remediate the prior owners' contamination. And that is nothing short of incredible.

Under 42 U.S.C. § 9607(a)(2), any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substance was disposed of is liable for certain costs of cleaning up the property.

---

2 Response at 6-7.

Under the majority view at the time Kerr-McGee entered into the consent order requiring it to remediate the Cushing site, the term "disposal" was interpreted in a passive as well as an active sense for purposes of determining whether a person was an owner and operator during the disposal of a hazardous substance.[3] Consequently, any migration of the sludge during Kerr-McGee's 16 years of being the owner and operator of the refinery constituted a "disposal" within the meaning of 42 U.S.C. § 9607(a)(2) and subjected Kerr-McGee to liability under that provision.

Under 42 U.S.C. § 9607(b)(3), a defendant can avoid liability under subsection (a) if it can show that the release of the hazardous substance was caused solely by an act or omission of a third party, other than, *inter alia*, one whose act or omission occurs in connection with a contractual relationship with the defendant. The defendant must also show that it exercised due care with respect to the hazardous substance.

Under 42 U.S.C. § 9601(35)(A), the term "contractual relationship," for purposes of § 9607(b)(3), includes deeds that transfer title, unless the property was acquired by the defendant after the disposal of the hazardous substance and the defendant can show one of the following: (i) it did not know about the hazardous substance when it acquired the property; (ii) it is a government entity that acquired the property under specified circumstances; or (iii) he or she acquired the property by inheritance or bequest.

Contrary to the Government's assertion, Kerr-McGee could not have satisfied the "third-party defense" of 42 U.S.C. § 9607(b)(3), since it could not possibly have shown that it was unaware of the presence of the hazardous substance when it acquired the property. Clearly,

3 *See* Robert L. Bronston, *The Case Against Intermediate Owner Liability Under CERCLA for Passive Migration of Hazardous Waste*, 93 Mich. L. Rev. 609, 610 (December 1994).

Kerr-McGee faced liability under CERCLA for the cleanup of the contamination put in the ground by prior owners.[4]

## ARGUMENT

*A. The* per se *result for liabilities assumed as part of the cost of an acquisition has no application to the undisputed facts of this case.*

In *Cinergy Corp. v. United States*, 55 Fed. Cl. 489 (2003), the Government failed to convince this Court that a taxpayer cannot deduct the cost of correcting defects that were present when the taxpayer constructed or acquired property. The Government essentially repeats the same argument in this case, repackaged to reflect the *Cinergy* decision and the factual differences between the cases.

The Government's confusion over the proper treatment of a taxpayer's remediation of pre-acquisition contamination is, in large part, an outgrowth of the broader legal rule that a taxpayer cannot deduct liabilities it assumes as part of the cost of acquiring property.[5] The rule requiring that assumed liabilities be capitalized helps insure that a taxpayer's cost basis reflects its true cost of acquiring property, and it prevents a taxpayer from converting its cost of purchase into deductible expenses. This line of cases involves a *per se* rule: if the liability assumption was a cost of acquisition, payment of the liability is not deductible.

---

[4] Since the parties' disagreement relates to the legal requirements of CERCLA, it does not raise an issue of fact.

[5] *See, e.g., David R. Webb Company, Inc. v. Commissioner*, 708 F.2d 1254 (7th Cir. 1983) (taxpayer must capitalize obligation to make pension payments assumed as part of cost of acquiring a business); *Pacific Transport Company v. Commissioner*, 483 F.2d 209 (9th Cir. 1973) (parent company that assumed liabilities of liquidated subsidiary must capitalize payment of court judgment entered against former subsidiary after liquidation); *Bloomfield Steamship Company v. Commissioner*, 33 T.C. 75 (1959), *aff'd per curiam*, 285 F.2d 431 (5th Cir. 1961) (taxpayer must capitalize expenditures to make newly acquired vessels seaworthy where purchase agreement required seller to reduce contract price to reflect such expenditures).

The Government's position that the cost of correcting a pre-acquisition defect must always be capitalized results from trying to import the *per se* outcome of the assumed-liability line of cases into the capital-expenditure-versus-deductible-repair cases. The fundamental issue in the repair cases is whether the taxpayer is simply trying to restore the status quo or is making a substantial improvement (in terms of the value or use of the property).[6] If the taxpayer "improves" the property by making it more valuable or more useful, the taxpayer's net income is best measured in the long run by offsetting the costs of the improvement against future income. If the taxpayer's expenditure does not make the property more valuable or more useful, the taxpayer's income is best measured by a current deduction.

When a taxpayer acquires property knowing that he must make certain expenditures to be able to use the property as he plans, the expenditures closely resemble an assumed liability. Unless the obligation was expressly assumed, however, courts have nonetheless applied the usual capital-expenditure-versus-deductible-repair analysis, with taxpayers winning some cases and losing others.[7]

The Government's position is that a *per se* rule like the one for assumed liabilities should apply in the case of pre-acquisition defects. There is no principled reason to create such a *per se* rule, especially when the pre-acquisition defect was latent. Instead, the proper questions to ask in such cases are: (1) does the expenditure substantially improve the value or use of the property

---

6 Section 263(a) of the Internal Revenue Code provides that no deduction is allowed for any amount paid out for new buildings or permanent improvements or betterments made to increase the value of any property. Treasury regulation section 1.263(a)-1(b) provides that capital expenditures include amounts paid or incurred to (1) add value to, or substantially prolong the useful life of, property owned by the taxpayer, or (2) adapt property to a new or different use.

7 *See* footnotes 12 and 13, *infra*.

or prolong its useful life; and (2) is the expenditure a discharge of a liability assumed in the acquisition? If the answer to both questions is "no," the expenditure is deductible.

*B. There is no absolute rule that a taxpayer cannot deduct the cost of correcting pre-acquisition conditions.*

1. The Government's reliance on *United Dairy Farmers, Inc. v. United States* is misplaced.

The Government cites *United Dairy Farmers, Inc. v. United States*, 267 F.3d 510 (6th Cir. 2001) ("*UDF*"), for the proposition that a taxpayer can never deduct the costs of correcting a problem that existed when the taxpayer acquired the property.[8] *UDF* should not be relied upon in this case because it is contrary to the case law and distinguishable.

*UDF* involved a taxpayer that acquired 60 7-Eleven convenience stores and a tire store. One of the 7-Eleven stores and the tire store had underground petroleum storage tanks that had leaked, causing soil contamination. There were no retail gasoline sales being conducted at the sites when the taxpayer acquired them. Retail gasoline operations had been conducted in the past, however. Prior to closing on the 7-Eleven store, the taxpayer received a report indicating the presence of "significant levels of petroleum hydrocarbons." The report gave a rough estimate of $55,000 to clean up the property. An addendum to the purchase contract provided that the taxpayer's obligation to purchase the property was contingent on its obtaining satisfactory soil/tank tests. Notwithstanding the environmental report, the taxpayer completed the purchase. 267 F.3d at 513 n.2

With respect to the tire store, the taxpayer initially waived the environmental contingency clause of the purchase contract. Then, one month before closing, the taxpayer obtained a report indicating that there was soil contamination from an underground storage tank leak. The report

---

[8] Response at 10.

estimated that it would cost $35,000 to $40,000 to clean up the site. The taxpayer completed the purchase nonetheless. *Id.*

The taxpayer eventually spent approximately $260,000 on the cleanup of the two sites.[9] The opinion does not say that the taxpayer was obligated to clean up the property, but it can safely be assumed that it did so because it had concluded either that the cleanup had to be done or that it would be beneficial to the taxpayer's future income-producing goals for the sites. However, the taxpayer had produced no comparison of the use of the properties before and after the soil remediation, and the court treated that omission as a failure to demonstrate that the use of the property was unchanged. 267 F.3d at 518-19. Therefore, the taxpayer had failed to prove its entitlement to a deduction for the cleanup costs.[10]

*UDF* relied on *Dominion Resources, Inc. v. United States*, 219 F.3d 359 (4th Cir. 2000); *Jones v. Commissioner*, 242 F.2d 616 (5th Cir. 1957); and *Jones v. United States*, 279 F. Supp. 772 (D. Del. 1968). *Dominion Resources* involved a taxpayer that operated a power plant, decommissioned the plant, and then years later remediated asbestos in the power plant so it could market the building as office space. In the *Jones* cases, the taxpayers acquired buildings in states of serious disrepair and rehabilitated the buildings in order to rent them to tenants.

In reaching its result, the *UDF* court misstated the law regarding pre-acquisition defects. "[W]e are able to derive one clear principle from *Dominion Resources* and the *Jones* cases: when a taxpayer improves property defects that were present when the taxpayer acquired the property, the remediation of those defects are [*sic*] capital in nature." *UDF*, 267 F.3d at 518.

---

9 Footnote 8 of the Response states that the taxpayer spent over $500,000. The court indicates that the cost was less than $260,000. 267 F.3d at 519.

10 The regulations under section 263 provide that expenditures that adapt property to a new use are capital expenditures. See footnote 6, *supra.*

That statement is, at best, only weakly supported by the cited cases, since *Dominion Resources* did not involve an acquisition and the *Jones* cases treated the extensive scope of the work, rather than the pre-acquisition nature of the property defects, as the important fact.[11] Furthermore, the analyses in the *Jones* cases are essentially the same as those found in cases involving taxpayers that allow their properties to decline into a state of serious disrepair and then rehabilitate the properties themselves.[12] Thus, the presence of pre-acquisition defects is treated as neutral in "plan-of-rehabilitation" cases such as the *Jones* cases. Finally, the *UDF* court's statement of the law is directly contradicted by other cases that allow a deduction for correcting pre-acquisition conditions.[13]

*UDF* also attempts to harmonize *Dominion Resources, Plainfield-Union Water Co. v. Commissioner*, 39 T.C. 333 (1962),[14] and Rev. Rul. 94-38 by concluding that they require a taxpayer to be the polluter in order to deduct environmental cleanup costs. That statement is unsupported, since none of the cited authorities involved a transfer of property. The court's

---

[11] "The work done 'was more like the reconstruction of a building gutted by fire than ordinary repairs to old apartments.'" 242 F.2d at 620 (quoting the taxpayer's application for a release from rent controls).

[12] *Compare Jones*, 242 F.2d 616, *Jones*, 279 F. Supp. 772, *and Hubble v. Estate of Kavanagh*, 54-1 U.S.T.C. ¶ 9364 (E.D. Mich. 1954), *with Jackson v. Commissioner*, 67 T.C.M. (CCH) 2392 (1994), *Saccone v. Commissione*r, 39 T.C.M. (CCH) 616 (1979), *and Seahill Co. v. Commissioner*, 23 T.C.M. (CCH) 408 (1964).

[13] *Buckland v. United States*, 66 F. Supp. 681 (D. Conn. 1946); *Allen v. Commissioner*, 15 T.C.M. (CCH) 464 (1956); *Mills v. Commissioner*, 4 T.C.M. (CCH) 863 (1945); *H.S. Crocker Co. v. Commissioner*, 15 B.T.A. 175 (1929) (involving a new lease); *Osage Steamship Co., Ltd. v. Commissioner*, 3 B.T.A. 141 (1925) (expressly rejecting the Commissioner's argument that expenditures must be capitalized because they corrected pre-acquisition defects).

[14] *Plainfield-Union* involved a water company that corrected tuberculation in its pipes by adding cement lining. In allowing a deduction, the Tax Court articulated the "restoration principle": "The proper test is whether the expenditure materially enhances the value, use, life expectancy, strength, or capacity as compared with the status of the asset prior to the condition necessitating the expenditure." 39 T.C. at 338.

failed harmonization is an extension of its misunderstanding of the law with respect to a taxpayer's correction of pre-acquisition conditions.

In any event, *UDF* is distinguishable from this case. One critical difference is that the taxpayer in *UDF* intended a new use for the sites. Kerr-McGee was simply satisfying its obligations under the consent order and did not intend any new use. That difference is important, since a new use is one of the three ways in which property can be improved within the meaning of section 263, and the *UDF* court concluded that the property had been improved because the taxpayer failed to demonstrate that it had not been adapted to a new use. *UDF*, 267 F.3d at 519.

A second difference is that in *UDF* the taxpayer acquired the property knowing that, if there were leaking underground storage tank on the sites, the taxpayer would have to clean them up.[15] In contrast, Kerr-McGee's obligation to clean up the Cushing site came into existence only with the enactment of CERCLA, almost 25 years after its initial acquisition.[16] Since the question is whether the taxpayer's undertaking to clean up the prior owner's contamination should be viewed as part of the cost of acquisition, the two cases lead to opposite conclusions.

The Government likens Kerr-McGee to the taxpayer in *UDF* because CERCLA had been enacted before Kerr-McGee re-acquired the property in 1984. The similarity is superficial. First, because it had previously owned and operated a refinery at the site for 16 years, Kerr-

---

15 *See California Casket Co. v. Commissioner*, 19 T.C. 32, 37 (1952) ("[T]he petitioner . . . acquired the building in question with the express intention and purpose of completely renovating and altering it to conform to the specific requirements of petitioner's business."); *see also La France Wine Co. v. Commissioner*, 33 T.C.M. (CCH) 1130 (1974) ("[I]f the petitioner had purchased the building knowing that the warehouse floor had to be replaced, it could not be seriously argued that the cost of such replacement should be charged to expense and deducted under section 162.")

16 The Government correctly notes that Kerr-McGee was aware of the waste pits when it acquired the property in 1956. The Government does not explain why that knowledge should affect whether Kerr-McGee's expenditures pursuant to a statute enacted 25 years after the acquisition are deductible.

McGee was already liable under CERCLA before it re-acquired the property and regardless of whether it owned the property.[17] Therefore, in no sense did Kerr-McGee assume the liability as part of its purchase price. Moreover, the re-acquisition was done not in order to produce future income but simply to facilitate Kerr-McGee's fulfillment of its obligation to clean up the property. The Government's assertion is a red herring, as indicated by the Service's allowance of a deduction for remediating the contamination Kerr-McGee placed in the ground, even though the same argument could have been made with respect to those cleanup costs as well.

A third important difference between this case and *UDF* involves the timing of the expenditures. In *UDF*, the taxpayer incurred the expenditures as it was beginning what it hoped would be a profitable investment in the property. Kerr-McGee, on the other hand, was forced to incur the remediation expenditures long after it had ceased its income-producing activities with respect to the property.[18] Thus, to achieve the goal of matching expenditures with related income, the cases should have different outcomes. In view of their forward-looking nature, it was appropriate that the *UDF* taxpayer's expenditures be offset against future income. In contrast, Kerr-McGee's expenditures should be offset against current income, since they were a retroactive cost of the former refinery operations.[19]

---

[17] *See* Robert L. Bronston, *The Case Against Intermediate Owner Liability Under CERCLA for Passive Migration of Hazardous Waste*, 93 Mich. L. Rev. 609, 610-11 (December 1994).

[18] The fact that the remediation costs were incurred after Kerr-McGee had stopped its refinery operations at the site is not a basis for concluding that those expenditures were not ordinary and necessary expenses of carrying on Kerr-McGee's trade or business. *Estate of Walling v. Commissioner*, 373 F.2d 190 (3d Cir. 1967) (allowing a deduction for repairs made by a seller pursuant to the sales contract and after it had sold the property).

[19] "Through provisions such as §162(a), §263(a), and related sections, the Internal Revenue Code generally endeavors to match expenses with the revenues of the taxable period to which the expenses are properly attributable, thereby resulting in a more accurate calculation of net income for tax purposes. . . . In determining whether current deduction or capitalization is the appropriate tax treatment for any particular expenditure, it is important to consider the extent to (continued)

2. The remediation expenditures at issue in this case satisfy the requirement that they be "appropriate and helpful" to Kerr-McGee's business.

Rev. Rul. 94-38 concludes that a taxpayer's cleanup of its own contamination is deductible. For an expense to be deductible under section 162, it must be a "necessary" expense, which courts have interpreted as imposing the minimal requirement that the expenditure be "appropriate and helpful."[20] One of the conclusions in the ruling is that the taxpayer's expenditures were "appropriate and helpful" to the taxpayer's business because they allowed the taxpayer to be in compliance with environmental laws.

The Government asserts that the ruling cannot apply to this case because the contamination was "caused by other parties years before plaintiffs operated the refinery" and was produced by a refinery process that was no longer in use when Kerr-McGee operated the refinery.[21] Kerr-McGee has already cited several cases permitting a deduction for the expense of cleaning up pre-acquisition conditions.[22] In the same vein, many courts have allowed taxpayers to deduct the cost of paying a liability that arose in the course of another person's business where the other person could not pay it and the taxpayer concluded that it would be beneficial to its own business to pay the liability. [23]

---

(continued from previous page)
which the expenditure will produce significant future benefits." Rev. Rul. 94-38 (citing INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992)).

20 *Commissioner v. Tellier*, 383 U.S. 687, 689 (1966) (quoting Welch v. Helvering, 290 U.S. 111, 113 (1933)).

21 Response at 9-10.

22 See footnote 13, *supra*.

23 *E.g.*, *Lutz v. Commissioner*, 282 F.2d 614 (5th Cir. 1960) (sole proprietor engaged in produce business allowed to deduct payment of liabilities of three corporations in which he owned partial interests that were also engaged in produce business and shared many customers with sole proprietor); *Lohrke v. Commissioner*, 48 T.C. 679 (1967) (patent owner allowed to deduct payment to buyer of defective product produced by licensee where payment made to
(continued)

Because it agreed to the consent order, Kerr-McGee has spent tens of millions of dollars to clean up the contamination put in the ground by the prior owners. It strains credulity to think that Kerr-McGee did anything other than make a business judgment that agreeing to pay those costs was "appropriate and helpful" to its own business. Moreover, as explained above, Kerr-McGee was exposed to liability under CERCLA for the contamination put in the ground by the prior owners. As was the case in the revenue ruling, it was "appropriate and helpful" for Kerr-McGee to remediate the property and thereby comply with applicable environmental laws.

Finally, Kerr-McGee benefited from agreeing to the consent order because it was part of an ultimately successful effort to convince the EPA not to include the Cushing site on the National Priority List, thereby reducing the administrative complexity and the costs of remediating the site.[24]

*C. The Government fails to meaningfully distinguish Kerr-McGee's authorities.*

In the Memorandum, Kerr-McGee demonstrated that the analysis in Rev. Rul. 94-38 (e.g., that there was no increase in value, there was no future benefit, the goal of matching expenditures with the income to which they are related was achieved, etc.) also applies in this case. Thus, but for the fact that the ruling involved contamination that the taxpayer itself had put in the ground, the ruling would clearly apply in this case.

---

(continued from previous page)
avoid harm to value of patent); *L. Heller & Son, Inc. v. Commissioner*, 12 T.C. 1109 (1949), *acq*., 1949-2 C.B. 2 (jewelry dealer allowed to deduct payment of insolvent subsidiary's debts where payment made on recommendation of leader of trade group that controlled taxpayer's credit rating); *Scruggs-Vandervoort-Barney, Inc. v. Commissioner*, 7 T.C. 779 (1946), *acq*., 1946-2 C.B. 5 (department store allowed to deduct costs of merchandise credits that it gave to former depositors of failed bank that was located in department store and was a subsidiary of department store's predecessor); Rev. Rul. 73-226, 1973-1 C.B. 62 (parent company in banking business allowed to deduct payments to customers of failed foreign subsidiary where payments made to prevent damage to parent company's goodwill).

[24] Px. A at 7, ¶ VI; Dx. 2 at 1-4; Response at 6 n.6.

The Government claims that factual difference distinguishes the ruling.[25] In reality, that factual difference is inconsequential in this case, since the migration of the contamination put in the ground by prior owners meant that Kerr-McGee contaminated the property for purposes of CERCLA. As a legal matter, therefore, Kerr-McGee cleaned up its own contamination. Accordingly, the revenue ruling is not distinguishable.

Kerr-McGee‘s Memorandum also relied on this Court’s decision in *Cinergy*, which allowed a deduction for remediation of asbestos used by the taxpayer in the construction of the property. In *Cinergy*, the Government relied on *UDF* for the proposition that “if a company acquires property with a flaw or frailty that, over time, deteriorates into a full-blown problem, the cost of remediation must be capitalized.” *Cinergy*, 55 Fed. Cl. at 519. This Court rejected that proposition as inconsistent with the cases discussed in the opinion, “all of which involved situations in which property constructed or purchased by the taxpayer had, at the time of construction or purchase, a potential defect that eventually required repairs.” *Id.*

The Government focuses on the language this Court used to distinguish *Cinergy* from *UDF*:

> By comparison, here, the need for removing and encapsulating the asbestos arose not from contamination that existed at the time the building was constructed in 1972, but because the asbestos became friable over time during the ordinary operation of the office building. As such, the case *sub judice* is not one in which “a taxpayer improves property defects that were present when the taxpayer acquired the property” [citation omitted] but one in which the contamination occurred over time, causing a health problem that was not anticipated at the time of construction.
>
> *Id.*

25 Response at 8.

The Government attempts to distinguish this case from *Cinergy* on the ground that, unlike the asbestos in *Cinergy* that became friable over time, the contamination in this case did not deteriorate over time. The Government overlooks the way CERCLA treats the migration of hazardous substances. Migration at the site exposed Kerr-McGee to liability for the contamination put in the ground by prior owners and, therefore, contributed to its "full-blown problem." That migration represents a "deterioration" of the site that makes the facts of this case much closer to the facts of *Cinergy* than to those of *UDF*.[26] Accordingly, *Cinergy* supports Kerr-McGee's position.

*D. Kerr-McGee's position best matches its costs with the revenues to which they are related.*

The goal of matching expenditures with the revenues to which they are related is best met by allowing a deduction in this case. The Supreme Court has identified this matching goal as the fundamental purpose of distinguishing between capital and deductible expenditures. The case for a deduction is much stronger in this case than it was in *Cinergy* or *UDF*. In those cases, the taxpayers at least had properties that could be used in their businesses. In this case, the taxpayer gains nothing from the expenditures.

The Government's Response makes the rather remarkable claim that Kerr-McGee's costs have no relationship to any income. It is beyond dispute that Kerr-McGee's operation of the refinery led to these major expenditures, that the expenditures were a retroactive cost of operating the refinery, and that there was a clear linkage between the expenditures and the income earned from the refinery.

---

[26] The consent order states, "The purpose of this consent order and plans implemented thereunder is to protect the public health and the environment through the prevention or reduction, to the greatest extent possible, of the release or migration of waste material to the groundwater, surface water, air , and soil in and around the Site." Px. A at 7, ¶ VI.

The Government argues that plaintiffs will "recoup" the expenditures because they may get a deduction for a portion of the costs, will qualify under section 198 for a deduction after August 5, 1997,[27] or will have a recoverable basis. Obtaining a future tax benefit is not the kind of benefit that courts have looked for in making the distinction between capital and deductible expenditures. Since capitalization always means an increase in basis and, therefore, a tax benefit, no court would ever grant a deduction under the Government's criterion. The future benefits that courts look for are economic benefits, such as rental income in the *Jones* cases and operating profits in *UDF*.

Unlike Kerr-McGee, the Government has not produced any argument that its position is consistent with the matching goal. To achieve that goal, Kerr-McGee's expenditures must be deductible.

**CONCLUSION**

Plaintiffs' motion for partial summary judgment should be granted.

Respectfully submitted,

Dated: March 7, 2007

s/ Stephen D. Gardner

STEPHEN D. GARDNER
Cooley Godward Kronish LLP
1114 Avenue of the Americas
New York, New York 10036-7798
(212) 479-6130

Attorney for Plaintiffs

OF COUNSEL:
Clint E. Massengill

[27] The Government's assertion regarding section 198 is wrong. Until being amended in 2000, that provision included a geographical limitation that prevented it from applying to the Cushing site. *See* Community Renewal Tax Relief Act of 2000, Pub. L. No. 106-554, § 162(a).

Docket No. 05-5 T

CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT was served on Attorneys for the Defendant by mailing the same via Federal Express on March 7, 2007 in a postage paid wrapper addressed as follows:

BENJAMIN C. KING, JR.
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
555 4th Street N.W.
Bldg JCB-Room 8804
Washington, DC 20001

and

DAVID GUSTAFSON
Chief, Court of Federal Claims Section
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
555 4th Street N.W.
Bldg JCB-Room 8804
Washington, DC 20001

Attorneys for Defendant

s/ Stephen D. Gardner
Stephen D. Gardner