# In the United States Court of Federal Claims

No. 05-5 T
(Filed: June 29, 2007)

************************************
KERR-MCGEE CORPORATION and SUBSIDIARIES, *

Plaintiffs, *

v. *

THE UNITED STATES, *

Defendant. *
************************************

Tax Refund; Motion for Partial Summary Judgment; 26 U.S.C. §§ 162, 263 (1994); Environmental Remediation Costs

Stephen D. Gardner, New York, NY, for plaintiffs.

Benjamin C. King, Jr., United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**

**SWEENEY**, Judge

Before the court is Plaintiffs' Motion for Partial Summary Judgment ("motion"), filed pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). Plaintiffs sought to deduct environmental remediation costs they incurred in 1995 and 1996 at an old oil refinery site pursuant to 26 U.S.C. § 162 (1994).[1] The Internal Revenue Service ("IRS") disallowed most of plaintiffs' deductions, insisting that plaintiffs instead capitalize the costs pursuant to 26 U.S.C. § 263. The court finds that plaintiffs may be able to deduct certain environmental remediation costs, but that it lacks sufficient evidence to determine the scope of plaintiffs' deductions. Because there remains a genuine issue of material fact, the court denies plaintiffs' motion.

[1] The court cites to the provisions of the Internal Revenue Code ("IRC") in effect during calendar years 1995 and 1996.

## I. BACKGROUND

### A. Factual History[2]

Kerr-McGee Corporation, organized under the laws of Delaware, is the successor in interest to Kerr-McGee Operating Corporation, "the common parent of an affiliated group of corporations that filed consolidated federal income tax returns for the years in issue."[3] Veazey Aff. ¶¶ 2-3. In 1956, Kerr-McGee purchased a site in Cushing, Oklahoma ("Cushing site" or "site") that consisted of approximately 440 acres of land and an oil refinery. Id. ¶ 4. Kerr-McGee paid $7,560 for the land and $3,492,440 for the refinery, and at the time of its purchase, Kerr-McGee "believed that the site was in compliance with state and federal environmental laws." Compl. ¶ 11.

The oil refinery on the Cushing site had been in continuous operation since 1915. App. 55. Between 1915 and 1951, the process used at the refinery created a waste containing clay, acid, and suspended asphaltine sludges ("acid waste"). Id. at 56. The acid waste was disposed of on the Cushing site in five unlined pits. Id. Then, in 1951, the refining process changed, which ended the creation of acid waste. Id. "No process or disposal records are available to indicate pit use after 1951." Id.

When Kerr-McGee purchased the site in 1956, four of the pits–pits 1, 2, 4, and 5–were "essentially full." Id. Kerr-McGee claims that it disposed of its refinery waste only in pit 4. Lux Ex. A at 2; see also App. 5 ("Pit 4 was used by Kerr-McGee to dispose of desalter refinery waste and waxy residues."). But see App. 56 (stating that Kerr-McGee did not use pits 1, 2, 4, or 5 to dispose of any refinery waste). Additionally, at some point after 1956, "[d]esalter and wax bottoms" may have been placed in pit 3. App. 92; see also id. at 56 ("Pit 3 reportedly received desalter and wax bottoms when the refinery was dismantled by Dewey Enterprises.").

In addition to using the Cushing site to refine oil, Kerr-McGee processed uranium, from early 1963 until September 1965, and thorium, from early 1965 until February 1966, on the site pursuant to licenses issued by the United States Atomic Energy Commission. Veazey Aff. ¶ 6; Compl. Ex. C at 5. As a result of these operations, Kerr-McGee disposed of an unknown amount of radioactive waste on the Cushing site. Lux Ex. B at 11. In particular, Kerr-McGee placed

---

[2] The facts in this section are taken from the Complaint ("Compl."), the exhibits attached to the Complaint ("Compl. Ex."), the Affidavit of Mark M. Veazey ("Veazy Aff."), the Affidavit of Jeff Lux ("Lux Aff."), the exhibits attached to the Affidavit of Jeff Lux ("Lux Ex."), and the appendix attached to Defendant's Opposition to Plaintiffs' Motion for Partial Summary Judgment ("App."). The exhibits attached to the Affidavit of Jeff Lux are not paginated; thus, the court cites to the page numbers assigned by the court's electronic case management system.

[3] For simplicity, the court will refer to Kerr-McGee Corporation, its predecessor corporations, and its affiliated subsidiaries as "Kerr-McGee."

"contaminated soils and trash" in pit 4. Id.; see also App. 56 (indicating that Kerr-McGee placed "thorium-contaminated soil and materials" in pit 4).

After discontinuing its refinery operations in 1972, Veazey Aff. ¶ 5, Kerr-McGee sold "most of the real and personal property used in the refinery operations" to Dewey Enterprises, an unrelated entity. Id. ¶ 7; App. 55. Dewey Enterprises "dismantle[d] the remaining refinery equipment for salvage." App. 55. Kerr-McGee retained ownership of a portion of the Cushing site "containing the current pipeline office, four aboveground storage tanks, and the southern tank farm with six above-ground tanks." Id.

In 1981, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Pub. L. No. 96-510, 94 Stat. 2767 (codified as amended at 42 U.S.C. §§ 9601-9675 (2000)) ("CERCLA"),[4] Kerr-McGee reported to the United States Environmental Protection Agency ("EPA") "the possible presence of certain wastes believed to have been disposed of at the site." Veazey Aff. ¶ 8. For several years thereafter, Kerr-McGee, the EPA, and the Oklahoma State Department of Health ("OSDH") investigated "the soil, surface water, and groundwater at the site." Id. ¶ 9. At the same time, Kerr-McGee reacquired the portion of the Cushing site that it had sold to Dewey Enterprises, as well as some contiguous parcels of land that it had never owned. Id. ¶ 10; see also App. 55-56 (noting that Kerr-McGee had reacquired some of the Cushing site in 1984 and more of the site in 1987). At the conclusion of the investigations, the EPA and OSDH determined that CERCLA required remediation of the contamination on the Cushing site. Veazey Aff. ¶ 11; see also Lux Ex. A at 6 (summarizing the EPA's allegations).

CERCLA assigns liability to "any person who at the time of disposal[5] of any hazardous substance owned or operated any facility[6] at which such hazardous substances were disposed of," unless that person can establish that the release of the hazardous substance was caused by a third party. 42 U.S.C. § 9607(a)-(b) (footnotes added). However, instead of litigating its liability under CERCLA, Kerr-McGee opted to remediate the Cushing site. Veazey Aff. ¶ 11. Thus, in 1990, OSDH and Kerr-McGee entered into a consent order in the District Court of Payne

---

[4] The provisions of CERCLA cited by the court have not changed since calendar years 1995 and 1996.

[5] "Disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing" of a hazardous waste so that the "waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 9601(29) (incorporating the definition of "disposal" from 42 U.S.C. § 6903).

[6] The term "facility" includes, among other things, buildings, structures, equipment, pipe or pipeline, wells, pits, storage containers, and "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9).

County, Oklahoma, obligating Kerr-McGee to perform certain remediation work at the site and providing for penalties if Kerr-McGee failed to comply with the consent order. Id. ¶ 12. See generally Lux Ex. A (consent order). The consent order covered the remediation of both the radiological waste located throughout the Cushing site, Lux Ex. A at 26-29, and the acid waste placed in all five unlined pits, id. at 30-32.

In compliance with the consent order, Kerr-McGee commissioned a "remedial investigation/feasibility study," id. at 9, and the resulting "Remedial Investigation Report" ("report") was issued by Burns & McDonnell Waste Consultants, Inc. in April 2003. App. 43, 51. The report noted that remediation of the radiological wastes was to be performed under a license issued by the United States Nuclear Regulatory Commission ("NRC"). Id. at 51; see also Lux Aff. ¶ 4 (noting the NRC license requirement). Indeed, in 1993, Kerr-McGee had obtained the required Special Nuclear Materials license from the NRC, Lux Ex. B, and subsequently remediated the radioactive waste between January 2000 and June 2005, Lux Ex. I at 4. Thereafter, on May 18, 2006, the NRC terminated the license. Id. at 2.

The report then addressed the nonradiological wastes located in the five unlined pits, labeling the acid waste as hazardous due to its high acid content. App. 58, 92. The report also found that the acid waste contaminated the Cushing site's shallow groundwater, id. at 53, 96-99, and surface water, id. at 53, 100-01.

During calendar year 1995, Kerr-McGee spent $3,711,305 to remediate the Cushing site. Veazey Aff. ¶ 13. Kerr-McGee deducted the total amount of these expenditures on its income tax return, but the IRS disallowed $3,115,742 of the deduction, requiring Kerr-McGee instead to capitalize that amount. Id. Then, during calendar year 1996, Kerr-McGee spent $5,400,165 to remediate the Cushing site. Id. ¶ 14. Kerr-McGee deducted the total amount of these expenditures on its income tax return, but the IRS disallowed $4,533,587 of the deduction, again requiring Kerr-McGee to capitalize that amount.[7] Id.

While remediating the Cushing site, Kerr-McGee entered into several agreements with third parties who wanted to use portions of the site. Lux Aff. ¶ 6. In 1994, Kerr-McGee granted a five-year easement to Multimedia Cablevision, Inc., which placed satellite dishes, radio towers, and a reception station on the site. Id. ¶ 6(b). The parties temporarily and inadvertently allowed the easement to lapse; but in May 2002, Kerr-McGee granted another five-year easement to Multimedia Cablevision, Inc.'s successor, Cox Communications, Inc., in exchange for $500. Id.;

---

[7] There is no evidence in the record that indicates why the IRS disallowed most of Kerr-McGee's deductions. However, Kerr-McGee asserts that the IRS disallowed the deduction of remediation expenses that were not attributable to contamination by Kerr-McGee. Plaintiffs' Motion for Partial Summary Judgment ("Mot.") 4, 7; Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment ("Reply") 1. Defendant concurs with Kerr-McGee's assertion. Defendant's Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Opp'n") 2.

Lux. Ex. G. In August 1995, Kerr-McGee leased certain parcels of the site to SemCrude, L.P. for $1 per year. Lux Aff. ¶ 6(a); Lux Ex. D. SemCrude, L.P. subsequently offered to purchase some of the parcels for $850 per acre. Lux Aff. ¶ 6(a); Lux Exs. E, F. According to an August 2000 "Public Health Assessment" prepared by the Agency for Toxic Substances and Disease Registry and Oak Ridge National Laboratory, Kerr-McGee indicated that "it would ultimately like to release the site without restriction for any combination of residential, commercial, or recreational development." App. 8.

Kerr-McGee continued to remediate the Cushing site until November 28, 2005. Veazey Aff. ¶ 15. On that date, Tronox Incorporated, a corporation spun off from Kerr-McGee, Lux Aff. ¶ 1, assumed the remediation efforts. Id.; Veazey Aff. ¶ 15. Kerr-McGee alleges that it spent $147 million to remediate the site through the end of 2005. Veazey Aff. ¶ 15. As of November 2006, only two parcels of the Cushing site have been released from further remediation efforts. Lux Aff. ¶ 7; Lux Ex. H.

**B. Procedural History**

Kerr-McGee filed its 1995 income tax return on September 16, 1996, and its 1996 income tax return on September 15, 1997. Compl. ¶¶ 17(b), 32(b). For both tax years, Kerr-McGee and the IRS repeatedly agreed to extend the time in which the IRS could assess any deficiencies pursuant to IRS Form 872, "Consent to Extend the Time to Assess Tax." Id. ¶¶ 18, 33. The agreements, which also extended the period within which Kerr-McGee could file a refund claim by six months, expired on December 31, 2003. Id.

Kerr-McGee filed a claim for refund of taxes paid for both the 1995 and 1996 tax years on December 18, 2003. Id. ¶¶ 17(e), 32(e). The IRS disallowed the claims on March 25, 2004. Id. ¶¶ 20, 35. Kerr-McGee filed alternative refund claims for tax years 1995 and 1996 on June 28, 2004. Id. ¶¶ 25(c), 40(c). On January 3, 2005, Kerr-McGee filed its Complaint in this court. After engaging in some discovery, the parties identified a threshold legal issue, "the resolution of which could eliminate the need for additional discovery or expert witness testimony." Joint Status Report, filed May 23, 2006. As framed by the parties, the legal issue now before the court is as follows:

> Should the plaintiff be required to capitalize otherwise deductible remediation costs incurred to clean up contamination that existed at the time the plaintiff acquired refinery sites in 1956 where the legal obligation to remediate the contamination first arose as a result of a law enacted in 1980?

Joint Status Report, filed June 28, 2006; see also Mot. 2.

## II. DISCUSSION

In its motion, Kerr-McGee contends that all of the remediation costs it incurred in 1995 and 1996 are deductible and that its purchase of the Cushing site after some of the contamination already had occurred and after the enactment of CERCLA does not change the deductibility of the costs. Mot. 6. In opposing Kerr-McGee's motion, defendant contends that "the cost of cleaning up the pollution that existed at the Cushing site when it was acquired by the plaintiffs first in 1956, and again in 1984, is a capital expenditure and not a deductible business expense." Opp'n 3. Based upon the parties' arguments, the court's inquiry is two-pronged. First, the court must decide whether remediation costs can ever be deducted–a question of law. Then, if the court finds that such costs can be deducted, it must determine whether such deductions are appropriate in this case–a question of fact.

### A. Standard of Review for an RCFC 56 Motion for Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. RCFC 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323. The moving party may discharge its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325. The moving party is not required to support its application with affidavits, but instead may rely solely on the pleadings, depositions, answers to interrogatories, and admissions. Id. at 324. The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial. Id. The nonmoving party must go beyond the pleadings and support its opposition with affidavits or with depositions, answers to interrogatories, and admissions. Id.

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Entry of summary judgment is mandated, "after adequate time for discovery," against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

### B. Categorizing Business Expenses Under the Internal Revenue Code

In computing its taxable income, a corporation is permitted to deduct from its gross income those expenditures enumerated in the IRC. 26 U.S.C. § 161. Corporations can deduct trade or business expenses pursuant to IRC § 162, which provides, in relevant part: "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business . . . ." Id. § 162(a). Thus, expenses incurred in

carrying on a business and deemed to be "ordinary and necessary" are deducted from gross income in the year that they are incurred. However, IRC § 263 prohibits current deductions for capital expenditures, including: "[a]ny amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." Id. § 263(a)(1). If an expense is capitalized, it is added to the value of the relevant asset and then "amortized and depreciated over the life" of that asset. INDOPCO, Inc. v. Comm'r, 503 U.S. 79, 83-84 (1992). Congress distinguished capital expenditures from "ordinary and necessary" business expenses in order "to match expenses with the revenues of the taxable period to which they are properly attributable, thereby resulting in a more accurate calculation of net income for tax purposes." Id. at 84.

The general rule is that "deductions are exceptions to the norm of capitalization." Id. Thus, the court must only allow deductions clearly provided for by the IRC. Id. However, the distinction between a current, deductible expense and a capital expenditure is one "of degree and not of kind." Welch v. Helvering, 290 U.S. 111, 113-14 (1933). Thus, the characterization of an expenditure as deductible or capital is heavily fact-dependent. INDOPCO, Inc., 503 U.S. at 85. The taxpayer bears the burden of proving that an expense is deductible. Id. at 84.

To show that a business expense is deductible, a taxpayer must show that it was a necessary and ordinary expense, "paid or incurred during the taxable year," for the purpose of "carrying on any trade or business." Comm'r v. Lincoln Sav. & Loan Ass'n, 403 U.S. 345, 353 (1971). Ordinary business expenses are those, while potentially unique to an individual business, that are expected within the community to which the business belongs. Welch, 290 U.S. at 114. Necessary business expenses are those that are appropriate and helpful to an enterprise. Id. at 113.

**C. Environmental Remediation Expenses Can Be Deducted in Certain Circumstances**

The court first addresses the overarching issue of whether environmental remediation costs ever may be deducted. In 1995 and 1996, the IRC did not contain any specific provisions allowing for the deduction of environmental remediation costs.[8] Thus, the court must determine whether the IRC provision permitting the deduction of certain business expenses, IRC § 162, encompasses such remediation costs. The plain text of IRC § 162 permits deductions for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business . . . ." 26 U.S.C. § 162(a); see also Lincoln Sav. & Loan Ass'n, 403 U.S. at 353 (parsing the statute's individual elements). Thus, if a taxpayer can show that all of the elements of IRC § 162(a) apply to environmental remediation expenses, a deduction should be permitted.

[8] The situation changed in 1997, when the IRC was amended to add § 198, captioned "Expensing of environmental remediation costs." Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 941(a), 111 Stat. 788, 882-84 (codified as amended at 26 U.S.C. § 198 (2000)).

The IRS has taken the position that in some circumstances, environmental remediation costs can be deducted pursuant to IRC § 162.[9] In Revenue Ruling 94-38, the IRS addressed a situation where a taxpayer purchased uncontaminated land, contaminated the land through its operation of a manufacturing plant, and then remediated the land to comply with local, state, and federal environmental laws. Rev. Rul. 94-38, 1994-1 C.B. 35. In analyzing the taxpayer's remediation expenditures, the IRS emphasized both the IRC § 263's bar to deducting amounts "paid out . . . for permanent improvements" and "the extent to which the expenditure will produce significant future benefits," and concluded:

> Under the facts of this ruling, the appropriate test for determining whether the expenditures increase the value of property is to compare the status of the asset after the expenditure with the status of that asset before the condition arose that necessitated the expenditure (i.e., before the land was contaminated by X's hazardous waste).

Id. Because the taxpayer's remediation efforts "merely restored [the] soil and groundwater to their approximate condition before they were contaminated by X's manufacturing operations," the IRS determined, within the narrow fact scenario presented, that the taxpayer could deduct the remediation expenses. Id. The IRS subsequently expanded the reach of Revenue Ruling 94-38 to situations where there was "an interim break in ownership." I.R.S. Tech. Adv. Mem. 9627002 (July 5, 1996). The IRS found that so long as the taxpayer claiming the deductions for remediation expenses was the entity that contaminated the property, a temporary break of ownership was not enough to disallow the deductions. Id.; see also I.R.S. Tech. Adv. Mem. 199952075 (Dec. 29, 1999) (concluding that a "[t]axpayer may currently deduct under § 162 the costs of cleaning up environmental contamination on its property to the extent that these costs are allocable to contamination that occurred during [the t]axpayer's ownership of the property").

Of course, revenue rulings and technical advice memoranda are not binding on this court. See 26 U.S.C. § 6110(j)(3) (indicating that such rulings and memoranda "may not be cited as precedent"). Revenue rulings, however, "can provide some guidance." St. Louis Bank for Coops. v. United States, 624 F.2d 1041, 1050 (Ct. Cl. 1980). The weight to be given a revenue ruling depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade . . . ." Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), cited in St. Louis Bank for Coops., 624 F.2d at 1051.

---

[9] In fact, in this case, defendant appears to concede that at least some of the remediation expenses incurred by Kerr-McGee in 1995 and 1996 are deductible, as it did not exclude all of Kerr-McGee's remediation-related deductions for those years. See Veazey Aff. ¶¶ 13-14 (explaining that, for the two years involved, the IRS permitted $1,462,141 of Kerr-McGee's total claimed deductions of $9,111,470).

In considering the persuasiveness of Revenue Ruling 94-38, the court examines other cases that have addressed the tax treatment of environmental remediation costs. Four decisions, two directly addressing the costs of remediating land and two addressing the costs of removal of asbestos-containing material from a building, are instructive. In the first case addressing the remediation of land, the taxpayer, a public utility, owned property containing a decommissioned power plant, attempted unsuccessfully to lease or dispose of the property, remediated the property, and then sought to deduct its remediation expenses. Dominion Res. Inc. v. United States, 219 F.3d 359, 370 (4th Cir. 2000). The taxpayer claimed that it remediated the property "to avoid the hazards and liability to trespassers or to third-parties down river if the property flooded," while the IRS maintained that the taxpayer "incurred these expenses primarily to adapt the property for use in [its] real estate development business." Id. (internal quotation and citation omitted). The district court ruled for the IRS, "finding that the environmental cleanup expenses were incurred to 'put' the property into a new condition rather than to 'keep' the property in its ordinary efficient condition." Id. On appeal, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") concluded:

> To distinguish between improvements that constitute deductible repairs and those that must be capitalized, the focus must be not on the amount of value added to the property by the improvements, but on the nature of the improvement. If the improvement permits the property to be utilized in a different way, the improvement is most appropriately considered a capital expenditure. If the improvement only restores value to the property that existed prior to deterioration or to a discrete event that damaged the property, the improvement may be properly treated as a deductible repair expense.

Id. at 371. Although the Fourth Circuit affirmed the district court's holding that the taxpayer could not deduct its environmental remediation expenditures, id. at 371-72, its legal conclusion allows for deductions in appropriate circumstances.

In the other land remediation case, the taxpayer, a manufacturer of dairy products, purchased property it knew was contaminated, remediated the property, and then sought to deduct its remediation expenses. United Dairy Farmers, Inc. v. United States, 267 F.3d 510, 512-13 (6th Cir. 2001). The United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") concluded that "when a taxpayer improves property defects that were present when the taxpayer acquired the property, the remediation of those defects are capital in nature." Id. at 518. Although the Sixth Circuit held that taxpayers could not deduct environmental remediation costs unless they contaminated the property, id. at 519, it did not impose a complete bar to the deduction of remediation expenses. See also id. (noting that taxpayers may deduct environmental remediation costs if they (1) contaminated the property in "the ordinary course of business"; (2) restored the property to its precontamination state; and (3) were not able to put the property to a new use upon remediation).

In the first asbestos-removal case, the taxpayer, a bank, built an office building using materials containing asbestos, decided to remodel the building more than fifteen years later, removed the asbestos-containing materials as part of the remodeling effort, and then sought to deduct the costs of removing the asbestos. Norwest Corp. & Subsidiaries v. Comm'r, 108 T.C. 265, 270-76 (1997). The United States Tax Court held that the taxpayer could not deduct the costs of removing the asbestos because the removal was part of a "general plan of rehabilitation and renovation" that must, therefore, be capitalized. Id. at 285.

In the other asbestos-removal case, the taxpayer, the owner of an office building, built an addition to the existing structure using materials containing asbestos, removed or encapsulated the asbestos-containing materials about seventeen years later, and then sought to deduct the removal costs. Cinergy Corp. v. United States, 55 Fed. Cl. 489, 498 (2003). The court held that the taxpayer could deduct, rather than capitalize, the remediation costs, concluding:

> [T]he expenditures attributable to the removal and encapsulation of the asbestos in the 1972 addition did not appreciably increase[] the value of [the taxpayer's] property, instead only restoring value to the property that existed prior to the asbestos becoming friable. . . . The expenditures also neither substantially prolonged the building's useful life, nor adapted the property to a new or different use.

Id. at 517.

In sum, according to the IRS and the relevant, but nonbinding,[10] case law, taxpayers may be able to deduct environmental remediation costs if the taxpayer caused the contamination and

---

[10] The United States Court of Federal Claims ("Court of Federal Claims") is bound by precedent of the Supreme Court and the United States Court of Appeals for the Federal Circuit ("Federal Circuit"). See FCC v. Pottsville Broad. Co., 309 U.S. 134, 140 (1940) ("[A] lower court is bound to respect the mandate of an appellate tribunal and cannot reconsider questions which the mandate has laid at rest."); Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1353 (Fed. Cir. 2006) ("There can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme Court, our court, and our predecessor court, the Court of Claims."). On the other hand, prior decisions of the Court of Federal Claims, "while persuasive, do not set binding precedent for separate and distinct cases" in the Court of Federal Claims. W. Coast Gen. Corp. v. Dalton, 39 F.3d 312, 315 (Fed. Cir. 1994). Likewise, holdings of federal district courts "are instructive but not precedential." AINS, Inc. v. United States, 365 F.3d 1333, 1336 n.1 (Fed. Cir. 2004); see also Am. Express Co. v. United States, 262 F.3d 1376, 1384 (Fed. Cir. 2001) (noting that the Federal Circuit is not bound by the decisions of the United States Tax Court). Further, decisions of other federal appellate courts, while "afforded great weight," are not binding on the Federal Circuit, Admiral Fin. Corp. v. United States, 378 F.3d 1336, 1340 (Fed. Cir. 2004), or on the Court of Federal Claims, Bankers Trust N.Y. Corp. v. United States, 225 F.3d 1368, 1371 (Fed. Cir. 2000).

remediated the contaminated property to return it to the state it was in prior to the contamination, regardless of whether the taxpayer continuously owned the property. On the other hand, these opinions and decisions instruct that remediation costs may more appropriately be capitalized if: (1) remediation allowed the taxpayer to put the property to a new and better use, whether or not the taxpayer caused the contamination or (2) the remediation was part of a general plan of renovation, rehabilitation, or improvement. The court finds that these general statements about the deductibility of remediation expenses comport with the dictates of IRC § 162 and IRC § 263. Expenditures incurred by a taxpayer in carrying on its trade or business to remediate property that it contaminated and that do not increase the value or change the use of the property may be classified by that taxpayer as ordinary and necessary business expenses instead of capital expenditures.[11] Thus, if a taxpayer presents the appropriate factual circumstances, it may deduct its remediation expenses.

### D. Kerr-McGee May Be Able to Deduct Certain Remediation Expenses, but the Factual Record Must Be Developed to Determine the Scope of Kerr-McGee's Deductions

While the deduction of environmental remediation expenses is possible, the record presently before the court cannot support a grant of Kerr-McGee's motion. Kerr-McGee's motion presents a broad issue: whether Kerr-McGee should "be required to capitalize otherwise deductible remediation costs incurred to clean up contamination that existed at the time [it] acquired [the] refinery sites in 1956." The court is not prepared, based on the record before it, to find that Kerr-McGee can deduct remediation expenses for contamination that occurred from 1915 to 1956. In order to make such a ruling, the court would need evidence that contamination on the Cushing site prior to 1956 can be attributed to Kerr-McGee. Although Kerr-McGee argues that "any migration of the sludge during [its] 16 years of being the owner and operator of the refinery" qualifies as contamination pursuant to CERCLA, Reply 3, 13, the record is devoid of any evidence concerning migration of the contamination on the Cushing site.[12] Accordingly, the court must deny Kerr-McGee's motion.

---

[11] The Sixth Circuit concludes that the taxpayer must "contaminate the property in the normal course of its business." United Dairy Farmers, Inc., 267 F.3d at 519 (emphasis added). Because IRC § 162(a) focuses on expenditures and not contamination, the court finds it more accurate to require that the expenditures be incurred in the normal course of business.

[12] The record is also devoid of any evidence of any migration of contamination that might have occurred after Kerr-McGee sold the Cushing site to Dewey Enterprises in 1972.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment is **DENIED**. By **no later than Friday, July 20, 2007**, the parties shall file a joint status report proposing further proceedings in this case.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge